862 A.2d 74

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Jose UDERRA, Appellant.**

Supreme Court of Pennsylvania.

Submitted Sept. 16, 2003.

Decided Oct. 21, 2004.

Reargument Denied Jan. 6, 2005.

494

496

Alexandra B. Fensterer, Esq., Christina Allison Swarns, Esq., Philadelphia, for Jose Uderra.

Hugh J. Burns, Esq., Amy Zapp, Esq., Philadelphia, Commonwealth of Pennsylvania.

BEFORE: CAPPY, C.J., and CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and BAER, JJ.

## OPINION

Justice SAYLOR.

Appellant, Jose Uderra, seeks relief from his conviction and sentence in this capital, post-conviction appeal.

In October of 1991, Appellant robbed, beat, shot, and killed Michael Sharpe in a Philadelphia street following a dispute concerning a sale of illicit drugs. In 1993, he was tried jointly with a coconspirator, Juan Perez, and convicted, *inter alia*, of first-degree murder. In the course of a penalty proceeding, the jury found one aggravating circumstance, that the killing was committed while in the perpetration of a felony, 42 Pa.C.S. § 9711(d)(6), and no mitigating circumstances, and, accordingly, sentenced Appellant to death. *See* 42 Pa.C.S. § 9711(c)(iv). Substitute counsel was appointed for the post-trial proceedings and appeal. Post-trial motions were denied, this Court affirmed the conviction and sentence, *see Commonwealth v. Uderra*, 550 Pa. 389, 706 A.2d 334 (1998), and the United States Supreme Court denied certiorari, *see Uderra v. Pennsylvania*, 526 U.S. 1070, 119 S.Ct. 1465, 143 L.Ed.2d 550 (1999).

Appellant subsequently filed a *pro se* petition for relief under the Post Conviction Relief Act, 42 Pa.C.S. §§ 9541–9546, which was amended then supplemented by appointed counsel. In these submissions, Appellant set forth claims deriving from: asserted violations of his constitutional rights arising from his trial counsel's failure to life qualify prospective jurors and to rehabilitate those who expressed opposition to the death penalty; alleged discriminatory use of peremptory challenges by the district attorney; the trial court's failure to conduct a competency hearing; claimed violations of Appellant's Confrontation Clause rights via admission into evidence at the joint trial of his non-testifying co-defendant's incriminatory confession; allegedly erroneous admission into evidence

of physical evidence seized from Appellant's person in violation of Fourth Amendment protections; trial counsel's purported failure to investigate, develop, and present guilt phase defenses concerning Appellant's intoxication and mental health deficits at the time of his offenses; the Commonwealth's asserted presentation of misleading evidence, which conflicted with the statement of a witness who was not called to testify at trial; the trial court's reasonable doubt charge; a claimed failure on the part of trial counsel to investigate, develop, and present substantial mitigating evidence at the penalty phase of trial; closing argumentation by the district attorney at the penalty phase; the trial court's jury instructions concerning the nature and use of aggravating and mitigating factors in penalty deliberations; the proportionality review performed by this Court; and assertedly misleading information concerning the character of a life sentence in Pennsylvania. Appellant also asserted an entitlement to discovery and an evidentiary hearing regarding witness participation in the Philadelphia District Attorney's Office witness security program. Furthermore, he charged that all of his prior counsel were ineffective for failing to litigate the claims that he raised in the post-conviction proceedings; he was entitled to relief from his conviction and sentence because of the cumulative effect of the alleged errors; and he was entitled to an evidentiary hearing. Appellant also submitted a series of affidavits, reports, records, and other documents as an evidentiary proffer.

The PCRA court denied the petition without an evidentiary hearing, holding that Appellant's pleadings failed to raise any issue of material fact that, if proven, would entitle him to relief. *See* Pa.R.Crim.P. 909(B)(2). Appellant filed a timely notice of appeal to this Court and has submitted a brief encompassing each of the issues raised in the PCRA court.

As a threshold matter, most claims arising out of a trial (including claims of trial court error and ineffective assistance of trial counsel) are waived if not raised and preserved at the time of trial and/or in the direct appeal. *See* 42 Pa.C.S. §§ 9543(a)(3), 9544(b). Accordingly, the bulk of Appellant's claims are presently cognizable only as derivative claims via

overlayering allegations of ineffective assistance on the part of trial and/or direct appeal counsel.[1] *See generally Commonwealth v. McGill,* 574 Pa. 574, 584–91, 832 A.2d 1014, 1020–25 (2003). Although in a number of instances our review, below, entails evaluation of the potential merit of underlying claims that are waived, such assessment is employed solely as a means of determining the viability of extant derivative claims and/or Appellant's entitlement to an evidentiary hearing with respect to the derivative claims. *See id.* at 591–92, 832 A.2d at 1024–25 (explaining that a layered claim cannot be sustained where the underlying claim is unmeritorious).

With this background, we review Appellant's claims in the order in which they are raised in his brief.

## A. Life Qualification and Rehabilitation from Death Disqualification

Appellant first argues that his Sixth, Eighth, and Fourteen Amendment rights were violated, because the trial court death qualified prospective jurors (or asked questions to ensure that each could impose a sentence of death), but did not similarly life qualify them to thus assure that each was capable of imposing a life sentence in appropriate circumstances. Relatedly, Appellant claims that counsel's stewardship was deficient in his failure to determine, by means of individual *voir dire,* whether the prospective jurors could fairly consider the possibility of a life sentence. Appellant acknowledges this Court's decisions holding that counsel will not be deemed ineffective for failing to life qualify a jury, *see, e.g., Commonwealth v. Bond,* 572 Pa. 588, 616–17, 819 A.2d 33, 50 (2002); *Commonwealth v. Rollins,* 558 Pa. 532, 543–44, 738 A.2d 435, 441 (1999); *Commonwealth v. Copenhefer,* 553 Pa. 285, 301–02, 719 A.2d 242, 250 (1998), but distinguishes them on the basis that the jurors empaneled in those cases indicated that they could decide the matters fairly in accordance with

1. The exceptions are aspects of Appellant's claims relating to this Court's proportionality review, entitlement to an evidentiary hearing on collateral review, as well as those matters deemed previously litigated on direct appeal, as discussed below.

the law. *See, e.g., Rollins,* 558 Pa. at 543–44, 738 A.2d at 441. According to Appellant, it is clear from the record that at least one juror was empaneled in his trial proceedings who would vote for death in every first-degree murder case. *See* N.T. May 24, 1993, at 99 (reflecting the response of the venireperson ultimately seated as Juror 3 to death qualification questioning by the district attorney, to the effect that she would impose a death sentence "[i]f I thought they did it"). Furthermore, Appellant complains that his trial counsel should have attempted to rehabilitate prospective jurors who expressed opposition to the death penalty. In particular, Appellant observes that venireperson 14 from panel 3 was stricken for cause without any questioning by, or objection from, defense counsel after the juror indicated that she had difficulty with the death penalty but could follow the law. *See* N.T. May 25, 1993, at 70–71. Appellant posits that the exclusion of this potential juror occurred under circumstances identical to those addressed by the Third Circuit in *Szuchon v. Lehman,* 273 F.3d 299, 328–31 (3d Cir.2001), in which federal *habeas corpus* relief was afforded.

■ As Appellant indicates, this Court applies the prevailing view that, although a capital defendant is entitled upon his request to inquire whether a prospective juror would automatically impose the death penalty, *see Morgan v. Illinois,* 504 U.S. 719, 736, 112 S.Ct. 2222, 2233, 119 L.Ed.2d 492 (1992), defense counsel is not constitutionally required to ask such questions. *See Bond,* 572 Pa. at 616–17, 819 A.2d at 50; *Rollins,* 558 Pa. at 543–44, 738 A.2d at 441; *Copenhefer,* 553 Pa. at 301–02, 719 A.2d at 250; *accord, e.g., Stanford v. Parker,* 266 F.3d 442, 454–55 (6th Cir.2001); *People v. Childress,* 191 Ill.2d 168, 246 Ill.Dec. 352, 730 N.E.2d 32, 36 (2000). As noted, Appellant attempts to distinguish this line of decisions, by indicating that one juror who sat in judgment of him and his co-conspirator stated during *voir dire* that she could impose the death penalty "[i]f I thought they did it," thus revealing an inherent bias. As the Commonwealth observes, however, Appellant fails to develop the context of this reference. Indeed, in the relevant line of questioning, the district

attorney repeatedly couched his questions in terms of the venireperson's ability to impose the death penalty in the event that she believed that it was warranted under the relevant facts and law.[2] Since Appellant offered nothing reasonably to suggest that any juror was inclined in all circumstances to sentence capital defendants to death, we find no error in the PCRA court's summary rejection of this claim.

■ Appellant's second line of argumentation, which concerns his trial counsel's failure to attempt to rehabilitate a venireperson who expressed her personal objection to exaction of the death penalty, derives from the following exchange:

[DISTRICT ATTORNEY]: As you have heard His Honor mention in his preliminary instructions, should you be part of this Jury and should the Jury return a verdict of guilty of murder in the first degree, we would then proceed to a second proceeding at which time the Jury considers the death penalty and the proper penalty. His Honor would instruct you on the law in Pennsylvania and you might hear

**2.** The relevant portion of the voir dire proceeded as follows:

[DISTRICT ATTORNEY]: His Honor has already asked you several questions, I want to ask you a follow-up question. Should you be part of this Jury and the—should the Jury decide this case and the Defendants are guilty of murder in the first degree, there would then be a second hearing. The Jury would consider the law and possibly additional evidence to determine whether to impose the death penalty or not. If you were part of that jury, *would you be able to stand and if you felt it was warranted under the facts and the evidence and the law*, would you be able to stand and announce such a verdict?
[VENIREPERSON]: If I thought they did it.
[DISTRICT ATTORNEY]: If you thought first they were guilty of murder in the first degree, would you be able to stand and announce such a verdict?
[VENIREPERSON]: Yes.
[DISTRICT ATTORNEY]: If you felt after that, after hearing additional evidence in a second hearing you felt *under the facts you heard in this hearing and the law* as was explained to you that the death penalty was warranted, would you be able to stand and announce that verdict?
[VENIREPERSON]: Yes.
[DISTRICT ATTORNEY]: Is there anything that you heard so far in the courtroom today that you feel you couldn't be fair to the Commonwealth and the Defense in this case?
[VENIREPERSON]: No.
N.T., May 24, 1993, at 99–100 (emphasis added).

additional evidence. If based upon the law and the evidence if you felt the death penalty were the proper penalty, would you be able to stand and announce such a verdict?

[VENIREPERSON]: I really think the death penalty, I would have a problem with.

[DISTRICT ATTORNEY]: Let me ask you this then. If your views on the death penalty were to conflict with what His Honor said the death penalty is proper under the law, would you be able to follow the law or would you follow your own views?

[VENIREPERSON]: I would follow the law, but I wanted to be honest about that.

[DISTRICT ATTORNEY]: Do you think your views on the death penalty would substantially impair your ability to consider and impose the penalty if it were warranted?

[VENIREPERSON]: Yes. I would have a problem with that.

N.T., May 25, 1993, at 70.

■ In *Witherspoon v. Illinois*, 391 U.S. 510, 521–22, 88 S.Ct. 1770, 1776–77, 20 L.Ed.2d 776 (1968), the United States Supreme Court held that a challenge for cause cannot be sustained based merely upon a venireperson's voicing of general objections to the death penalty or expression of conscientious or religious scruples against its imposition. *See id.* at 522, 88 S.Ct. at 1777. Rather, exclusion for cause is warranted only if the venireperson's views " 'would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985) (quoting *Adams v. Texas,* 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980)). Nevertheless, the Court has also recognized the impracticability of a rigorous proof requirement, *see id.* at 424, 105 S.Ct. at 852 (observing that a juror's bias need not be proven with "unmistakable clarity," because "determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism"), and accordingly, directed the affordance

of substantial deference in favor of the determination of the trial judge, who has seen and heard the venireperson. *See id.* at 425–26, 105 S.Ct. at 852–53; *accord Rollins,* 558 Pa. at 544, 738 A.2d at 442 (citation omitted).

In the present case, although certainly there is some degree of ambiguity in the venireperson's response, we agree with the Commonwealth that the trial court could have been "left with the definite impression that [she] would be unable to faithfully and impartially apply the law." *Wainwright,* 469 U.S. at 426, 105 S.Ct. at 853.[3] Appellant has proffered no evidence to rebut the trial court's finding that the venireperson should have been removed for cause, or to suggest that further examination would have been helpful. *Cf. DeLong v. Thompson,* 790 F.Supp. 594, 603 (E.D.Va.1991) (observing that jury selection is particularly within counsel's expertise and judgment). Since Appellant has offered nothing to establish that his trial counsel acted unreasonably in failing to attempt to rehabilitate the venireperson, we will not disturb the PCRA court's dismissal of this claim. *Accord Williams v. Collins,* 16 F.3d 626, 633 (5th Cir.1994) (denying an ineffective-assistance-of-counsel claim based on a failure to rehabilitate three potential jurors excused for cause, where their answers to prior questioning suggested they would not have been able to function properly in capital sentencing proceedings); *Sawyer v. Butler,* 848 F.2d 582, 589 (5th Cir.1988) (finding no discernable prejudice in capital counsel's failure to rehabilitate venirepersons who indicated that they could not impose the death penalty, where the defendant failed to demonstrate that rehabilitation was possible). Indeed, trial counsel may very well

3. Contrary to Appellant's argument, the case is distinguishable from the Third Circuit's decision in *Szuchon,* 273 F.3d at 299, in which a juror was removed for cause after stating that he did not believe in capital punishment, but there was no further questioning to determine whether his ability to follow the law was substantially impaired. *See id.* at 329–30. Here, further questioning in fact ensued; indeed, the district attorney expressly pursued a line of questioning centered on the critical inquiry concerning whether the prospective juror's beliefs would substantially impair her ability to apply the law. While the venireperson did at one point express that she could follow the law, her succeeding response contained an apparent contradiction.

have been pleased to have the juror dismissed, since her son was the victim of a robbery. *See* N.T. May 25, 1993, at 67.

### B. Asserted Discriminatory Use of Peremptory Challenges

█ Appellant, who is of Latin American ethnicity, next claims that the district attorney improperly utilized peremptory challenges to exclude four of five Latino venirepersons from the jury, thus violating his constitutional rights.[4] According to Appellant, there is no apparent reason for the prosecutor's strikes against Latinos; the excluded persons were not meaningfully distinguishable from the seated jurors other than by way of reference to their ethnic heritage; and, as such, it is clear that ethnicity played an impermissible role in the prosecutor's exercise of her peremptory challenges. Appellant contends that this alleged approach was consistent with an asserted policy and practice of the Philadelphia District Attorney's Office to exclude minorities from juries, as evidenced by a 1987 training videotape prepared by that office, in which a prosecutor explicitly advocated discriminatory peremptory challenges. *See generally Commonwealth v. Basemore*, 560 Pa. 258, 275–85, 744 A.2d 717, 727–32 (2000). As his evidentiary proffer, Appellant presented the transcript of the training video and refers to excerpts from the *voir dire* record. Furthermore, Appellant made reference to (but did not provide) portions of the quarter sessions file, various voter registration records, and census data. Although Appellant recognizes that there are gaps in the information that he has supplied, he urges that he has made a sufficient showing to implicate a hearing, and that the Commonwealth should be required to disclose any and all information in its possession regarding the race of such jurors. Appellant acknowledges this Court's requirements to establish a claim of discriminatory practices

---

**4.** Although Appellant facially invokes the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, as well as Article I, Sections 8, 9 and 13 of the Pennsylvania Constitution, his arguments are framed around the United States Supreme Court's seminal Fourteenth Amendment decision in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and therefore, will be addressed as such.

in jury selection initially set forth in *Commonwealth v. Spence*, 534 Pa. 233, 627 A.2d 1176 (1993), namely, that the defendant must present a record identifying the race of venirepersons stricken by the Commonwealth, the race of prospective jurors acceptable to the Commonwealth but stricken by the defense, and the racial composition of the final jury selected. *See id.* at 246, 627 A.2d at 1182–83. According to Appellant, however, those requirements (which were the basis of the PCRA court's dismissal of the *Batson* claim) are unduly burdensome and inconsistent with the federal case law, as such information is not necessary to the determination of a *Batson* violation. Appellant's position is that what is significant under *Batson* is not the final composition of the empaneled jury or how many jurors the defense struck, but rather, whether the evidence arguably demonstrates a prosecutor improperly used any preemptory strike to exclude a juror on a prohibited basis. Appellant includes allegations of, and arguments concerning, layered ineffectiveness of counsel within his presentation.

The Commonwealth argues that the PCRA court's invocation of the *Spence* requirements was correct. Further, the Commonwealth catalogs the substantial omissions in the data upon which Appellant relies, including the failure to identify the race or ethnicity of at least sixteen venirepersons who either served on the jury or were stricken by the Commonwealth or the defense. Given such deficits, the Commonwealth urges that Appellant's claim that the district attorney struck eighty percent of Latino venirepersons must be regarded as unsubstantiated. The Commonwealth highlights that the prosecutor did accept at least one Hispanic juror, who was removed by Appellant himself via his own peremptory challenge; according to the Commonwealth, the prosecutor's acceptance of this venireperson substantially undermines Appellant's present claim of discriminatory conduct. Additionally, the Commonwealth questions the sufficiency of Appellant's proffer to establish that the four stricken venirepersons in question were in fact of Latino ethnicity. In this regard, for example, the Commonwealth notes that one of these jurors identified himself as "White" on his juror questionnaire. Ad-

ditionally, the Commonwealth asserts that the *voir dire* record discloses plainly race-neutral grounds for the district attorney's conduct in striking all implicated venirepersons. Finally, the Commonwealth contends that the 1987 videotape training session is irrelevant to the claim of racial discrimination in jury selection in Appellant's case, tried six years later by a different prosecutor.

By way of background, the United States Supreme Court has, on multiple occasions, reaffirmed the principle that the government denies a defendant equal protection of the laws when it "puts him on trial before a jury from which members of his race have been purposefully excluded." *Batson*, 476 U.S. at 85, 106 S.Ct. at 1716. *Batson* established the following three-part inquiry for evaluating a defendant's claim of racial discrimination in jury selection:

First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.

*Hernandez v. New York*, 500 U.S. 352, 358–59, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991) (plurality) (citing *Batson*, 476 U.S. at 96–98, 106 S.Ct. at 1722–24).[5]

■■ To establish a *prima facie* case under *Batson*, the defendant must prove that: he is a member of a cognizable racial or ethnic group; the State exercised its peremptory challenges to remove members of such group from the venire; and other relevant circumstances raise an inference that the State used peremptory challenges to exclude venirepersons from the same racial or ethnic group. *See Batson*, 476 U.S. at 96, 106 S.Ct. at 1723.[6] In connection with this inquiry, the

5. *Hernandez* also made fairly clear that *Batson* principles extend to ethnicity-based claims. *See id.*

6. *Powers v. Ohio*, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), modified the elements of a *prima facie* case somewhat by holding that

defendant is entitled to rely on the fact that "peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.' " *Id.* at 96, 106 S.Ct. at 1723. The necessary *prima facie* case (i.e., inference of discrimination) may be demonstrated by reference to the totality of relevant circumstances. *See id.* at 93–94, 106 S.Ct. at 1721. For example, the inference may derive from a pattern of strikes against minority jurors or from the manner of the prosecution's questions and statements during *voir dire* examination. *See id.* at 97, 106 S.Ct. at 1723.[7]

On appeal, in determining whether a defendant has established a *prima facie* case of a *Batson* violation, and on post-conviction review, this Court has generally enforced a requirement of a full and complete record of the asserted violation. Specifically, the defendant has been required to present a record identifying the race or ethnicity of the venirepersons stricken by the Commonwealth, the race of prospective jurors acceptable to the Commonwealth but stricken by the defense, and the racial composition of the final jury selected. *See, e.g., Commonwealth v. Holloway,* 559 Pa. 258, 270, 739 A.2d 1039, 1045 (1999) (citing *Commonwealth v. Bronshtein,* 547 Pa. 460, 477, 691 A.2d 907, 915 (1997)).[8] In light of the deficiencies

racial identity between the defendant and the excluded venirepersons is not necessary. *See id.* at 415, 111 S.Ct. at 1373.

7. The Third Circuit has identified the following five factors as useful in this inquiry:

1) the number of racial group members in the panel; 2) the nature of the crime; 3) the race of the defendant; 4) a pattern of strikes against racial group members; and 5) the questions and statements during the voir dire.

*United States v. Clemons,* 843 F.2d 741, 748 (3d Cir.1988).

8. *See also Rollins,* 558 Pa. at 545–46, 738 A.2d at 442–43 (citing *Commonwealth v. Thomas,* 552 Pa. 621, 634, 717 A.2d 468, 474–75 (1998) (quoting *Commonwealth v. Simmons,* 541 Pa. 211, 231–32, 662 A.2d 621, 631 (1995))); *Commonwealth v. Hackett,* 558 Pa. 78, 89, 735 A.2d 688, 694 (1999) (citing *Commonwealth v. Baez,* 554 Pa. 66, 116, 720 A.2d 711, 736 (1998), and *Spence,* 534 Pa. at 246, 627 A.2d at 1182–83); *Commonwealth v. Porter,* 556 Pa. 301, 322, 728 A.2d 890, 900 (1999) (citations omitted); *Commonwealth v. Dennis,* 552 Pa. 331, 342–43, 715 A.2d 404, 409 (1998) (citations omitted).

identified by the Commonwealth, Appellant's present proffer, even if accepted as true, would clearly fail to meet this test.

Recently, however, and after the filing of the parties' briefs in this case, the Third Circuit found that this Court's particularized requirements of proof to support a *prima facie* case constitute an unreasonable application of federal law. *See Holloway v. Horn*, 355 F.3d 707, 728–29 (3d Cir.2004) (holding that "requiring the presentation of such a record simply to move past the first stage of the *Batson* analysis places an undue burden upon the defendant"). Briefly, the federal court explained that the *Batson* standard for assessing a *prima facie* case is flexible, because confidence is invested in the capacity of trial judges to discern the presence or absence of discrimination based on the evidence before them. *See id.* at 728. The Third Circuit acknowledged that, under *Batson*, a defendant certainly must identify the race of the venireperson stricken if he wishes to raise a race-based challenge, and, if he seeks to rely on an asserted pattern of strikes, he must develop an adequate record establishing each assertedly race-based strike. *See id.* But the court also emphasized that, under *Batson*'s totality-based standard, there are multiple ways to support an inference of discrimination, not all of which would necessarily depend on the extensive record contemplated in this Court's requirements. *See id.* (observing that "a defendant's *Batson* objection need not always be based on a 'pattern' of strikes; it can be based, for example, on a single strike accompanied by a showing that the prosecutor's statements and questions to the juror (or to prior jurors) support an inference of discrimination"). In particular, the Third Circuit criticized the requirement that the defendant present a record of the race of jurors who served and the race of jurors acceptable to the Commonwealth who were stricken by the defense. *See Holloway*, 355 F.3d at 728 ("The final composition of the jury (or even the composition of the jury at the time the *Batson* objection is raised) offers no reliable indication of whether the prosecutor intentionally discriminated in excluding a member of the defendant's race"; further, "defense strikes are irrelevant to the determination of whether

the prosecutor has engaged in discrimination [—][i]nstead, the focus properly falls on the prosecutor's actions, looking primarily at whether there is a pattern of strikes and whether the prosecutor's questions and statements support or refute an inference of discrimination.").[9]

The Third Circuit's points are most resonant in a case such as *Holloway,* in which the assessment on appeal is of objections raised during the *voir dire* process, thus triggering contemporaneous identification of the racial or ethnic heritage of venirepersons in question, explanations from the prosecutor concerning the basis for his strikes, and an essential evaluation by the trial court. *See Holloway,* 355 F.3d at 712 (noting that *Holloway* created a record as to the race of the stricken venirepersons, and moved for a mistrial on the ground that a pattern of purposeful discrimination had been established). Greater difficulties arise, however, in cases such as the present one, in which there simply was no *Batson* objection raised during the *voir dire* process to trigger the requisite, contemporaneous inquiry. In such circumstances, where the record was not appropriately focused and channeled at trial, and, concomitantly, the trial court has not been asked to make the necessary findings that would be generate the deference undergirding the *Batson* burden-shifting construct, it is exponentially more difficult to perform a reasoned assessment concerning the presence or absence of purposeful discrimination. *See generally Basemore,* 560 Pa. at 279, 744 A.2d at 729 ("Absent a timely objection and preservation of a trial record, there will most often be no proof of the race of venirepersons;

9. *Accord Simmons v. Beyer,* 44 F.3d 1160, 1168 (3d Cir.1995) (holding that a *prima facie* case was established via a combination of the defendant's race, the prosecution's exclusion of at least one potential juror of the same race, and the circumstances surrounding the crime); *see also Fernandez v. Roe,* 286 F.3d 1073, 1078–79 (9th Cir.2002) (holding that, where Hispanics represented 12 percent of the venire, 21 percent of prospective juror challenges were made against Hispanics, and the prosecutor struck four of seven (57 percent) of them, the defendant established a *prima facie* case); *United States v. Alvarado,* 923 F.2d 253, 255–56 (2d Cir.1991) (holding that a *prima facie* case was established where four of seven (57 percent) of peremptory strikes were used against African Americans, who represented 29 percent of the relevant population).

the prosecutor will have had no reason to provide race-neutral explanations; the trial judge will have had no evidence to weigh nor occasion to make an assessment; and, ultimately, there will be nothing available to review on appeal."); *McCrory v. Henderson*, 82 F.3d 1243, 1249 (2nd Cir.1996) (referencing the "problems of responding to, ruling on, and remedying belated *Batson* challenges"). Indeed, in such instances, it appears to be an emerging view that a defendant is not entitled the benefit of *Batson*'s burden-shifting formula, but instead, bears the burden in the first instance and throughout of establishing actual, purposeful discrimination. *See, e.g., McCrory*, 82 F.3d at 1251 ("*Batson*'s burden-shifting formula makes sense when applied to an objection raised sufficiently promptly that the attorney exercising the challenges can reasonably be expected to remember the reasons for the challenges. On the other hand, it would be altogether unreasonable to shift the burden of explanation if the objection is so tardily made that the challenging attorney cannot be reasonably expected to remember."); *cf. Ford v. Georgia*, 498 U.S. 411, 422, 111 S.Ct. 850, 857, 112 L.Ed.2d 935 (1991) (stating in *dictum* that "The requirement that any *Batson* claim be raised not only before trial, but in the period between the selection of the jurors and the administration of their oaths, is a sensible rule."). This view comports with the heightened criteria for obtaining post-conviction relief, which include the requirement to demonstrate prejudice, *see* 42 Pa.C.S. § 9543, and for relief in situations in which an underlying claim is waived,[10] and therefore, must be raised, if at all, through a derivative claim of ineffective assistance of counsel. *See generally Commonwealth v. Kimball*, 555 Pa. 299, 312–13, 724 A.2d 326, 333 (1999).[11]

A majority of this Court is of the view that it would represent *dictum* to undertake in this case to reconsider the validity of the *Spence* requirements in light of the Third

**10.** Appellant's direct *Batson* challenge is waived by virtue of his failure to raise it at trial and on direct appeal. *Accord, e.g., Commonwealth v. Wharton*, 571 Pa. 85, 104–05, 811 A.2d 978, 989–90 (2002).

**11.** Notably, the Third Circuit addressed *Holloway's Batson* claim directly, and not in a derivative form. *See Holloway*, 355 F.3d at 713–14.

Circuit's *Holloway* decision.[12] We do note, however, that the Third Circuit's analysis is least resonant in relation to claims deriving from the absence of an appropriate *Batson* challenge at trial. *Cf. Holloway*, 355 F.3d at 728 ("A trial judge undoubtedly might find in a given case that a full accounting regarding the race of the venire and the jurors struck would be helpful at the third state of the *Batson* analysis, after it has heard the prosecutor's explanation for the strikes and must 'determine if the defendant has established purposeful discrimination.'" (quoting *Batson*, 476 U.S. at 98, 106 S.Ct. at 1724)). In such circumstances, in order to succeed on an unpreserved claim of racial discrimination in jury selection, we agree with those jurisdictions that have held that a post-conviction petitioner may not rely on a *prima facie* case under *Batson*, but must prove actual, purposeful discrimination by a preponderance of the evidence, *accord McCrory*, 82 F.3d at 1251, in addition to all other requirements essential to overcome the waiver of the underlying claim.

Appellant has not had the opportunity to establish actual, purposeful discrimination in jury selection at the post-conviction stage, since he was denied a hearing by the PCRA court. The remaining inquiries, therefore, concern whether Appellant's proffer, if believed, would establish actual, purposeful discrimination, and whether Appellant is due additional discovery.

As to Appellant's proffer, he offers to present no direct evidence of purposeful discrimination. The training videotape

12. This author, however, is of a contrary view, since the *Spence* requirements were the basis for the PCRA court's disposition and have been challenged by Appellant in this appeal on grounds identical to those that prevailed before the Third Circuit in *Holloway*. Although the Commonwealth has not undertaken to address this challenge, it was confronted with Appellant's argument, and thus, had the opportunity to do so in its responsive brief. Moreover, the case is a direct (and not a discretionary) appeal; therefore, the Court lacks the latitude to delay its review of validly asserted challenges for prudential reasons. Accordingly, this author would take this opportunity to express agreement with the Third Circuit's view that this Court's particularized requirements for development of the record are too stringent at least as applied across the board in relation to any and all challenges to asserted racial discrimination in jury selection.

is substantially remote from Appellant's trial, both temporally (as there is a six-year time lapse between the events) and factually (since a different prosecutor represented the Commonwealth at Appellant's trial). *See generally Commonwealth v. Morris,* 573 Pa. 157, 180, 822 A.2d 684, 697–98 (2003). In terms of ethnic identities of venirepersons, Appellant's assessment of the trial record, voting and census records is in summary form and appears to place substantial reliance on surnames alone. *Cf. Rico v. Leftridge–Byrd,* 340 F.3d 178, 185 (3d Cir.2003) ("We have not permitted a defendant to base a *Batson* challenge solely on the fact that a potential juror has an Italian surname." (citing *United States v. Di Pasquale,* 864 F.2d 271, 277 (3d Cir.1988)). In the absence of some explanation for why particular jurors were stricken, Appellant's efforts to compare characteristics of empaneled jurors with stricken ones are abstract and of very limited value in terms of satisfaction of his burden of proof. *Cf. McCrory,* 82 F.3d at 1247–48 (explaining the rationale for requiring *Batson* objections to be raised before the completion of jury selection and observing that "challenges are often based on ... subtle, intangible impressions"). Additionally, the substantial gaps in the information are highlighted by the Commonwealth and acknowledged by Appellant. Thus, although we acknowledge the potentially racial or ethnic configuration of the crime (since the victim was an African American), *see Simmons,* 44 F.3d at 1168 (noting that the nature of the crime and its racial configuration would contribute significantly to a *prima facie* case under *Batson*'s first step), we hold that Appellant's proffer, if believed, is insufficient to establish actual, purposeful discrimination.

Concerning Appellant's request for additional discovery, the record of the PCRA proceedings reflects the filing of Appellant's discovery motion, the common pleas court's directive to the Commonwealth to provide discovery materials, and the court's assessment, apparently based on the report of the parties at a status conference, that discovery was complete. Nothing of record memorializes any indication to the common pleas court of any dissatisfaction on the part of Appellant

concerning the extent of the discovery furnished on his motion. In light of this background, and since Appellant's present request for additional information is undeveloped and provides no explanation concerning its presentation for the first time in the appeal phase of this post-conviction proceeding, it does not furnish a basis for relief and will be denied.

### C. Failure to Afford a Competency Hearing

██ Appellant next claims that he is entitled to relief from his conviction and sentence, because he was not afforded a competency hearing despite indicia that he was actually incompetent at trial. In this regard, Appellant refers to prison records that indicate that he was placed on suicide watch in the Philadelphia County jail three days prior to the commencement of jury selection, and an inmate accident report that states that Appellant slammed his head into the wall of the courtroom on the day that the jury returned its verdict at trial. Appellant contends that the trial court erred in failing to order a hearing; the Commonwealth improperly failed to disclose the asserted evidence of Appellant's incompetency to the trial court and trial counsel; and trial counsel was ineffective for failing to bring this evidence to the attention of the trial court. Appellant emphasizes that, by their nature, claims of incompetency are subject to a "no waiver" rule. *See Commonwealth v. Marshall*, 456 Pa. 313, 319, 318 A.2d 724, 727 (1974) (citing *Pate v. Robinson*, 383 U.S. 375, 384, 86 S.Ct. 836, 841, 15 L.Ed.2d 815 (1966)).

██ Appellant is correct in his assertion that, where there is reason to doubt the defendant's competency, the trial court is required conduct a competency hearing. *Commonwealth v. Starr*, 541 Pa. 564, 589–90, 664 A.2d 1326, 1339 (1995) (citing *Drope v. Missouri*, 420 U.S. 162, 171–72, 95 S.Ct. 896, 903–04, 43 L.Ed.2d 103 (1975)). Competency to stand trial, however, is measured according to a defendant's ability to understand the nature and object of the criminal proceedings and to participate and assist in his defense. *See Commonwealth v. Appel*, 547 Pa. 171, 187–88, 689 A.2d 891, 899 (1997) (citing 50 P.S. § 7402(a), and indicating that "[s]tated

otherwise, the relevant question is whether the defendant has sufficient ability at the pertinent time to consult with counsel 'with a reasonable degree of rational understanding,' and have a 'rational as well as a factual understanding of the proceedings.' " (citation omitted)). Here, we agree with the Commonwealth that Appellant's proffered proofs (an unexplained temporary placement on jail suicide watch and an impulsive physical act in response to his conviction of first-degree murder) are insufficient to bring competency on such terms into question, particularly in light of the record of Appellant's extensive assistance in his own defense, including his testimony at the penalty phase of trial. *See* N.T., June 7, 1993, at 4–25. Notably, as well, at the post-conviction stage, Appellant has not attempted to supplement his proofs with a proffer of expert evidence concerning his ability at trial to understand the proceedings and assist in his defense. In such circumstances, we conclude that the PCRA court did not err in its summary dismissal of this claim.

### D. Alleged Confrontation Clause Violations

 Appellant's next claim is that the introduction of his co-defendant's redacted statement as part of the Commonwealth's case against the co-defendant at the joint trial violated Appellant's rights under the Confrontation Clause of the United States Constitution as articulated in the United States Supreme Court's seminal decision in *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) (holding that a defendant's right to confrontation is violated when a non-testifying co-defendant's confession that inculpates the defendant is introduced in a joint trial, because there is a high risk that, notwithstanding instructions to the contrary, the jury will consider the statement against the defendant). Appellant observes that, although the statement was redacted to replace the references to Appellant with the symbol "X" in an effort to satisfy *Bruton*'s requirements, on direct appeal this Court recognized that a *Bruton* violation occurred. *See Uderra*, 550 Pa. at 399, 706 A.2d at 339.[13] Appellant acknowledges

13. Pursuant to *Gray v. Maryland*, 523 U.S. 185, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998), use of symbols is an impermissible method of

that the Court also determined that no relief was due as the error did not affect the trial, *see id.*, but contends that, in the underlying analysis, the Court inappropriately allocated the burden of establishing prejudice to Appellant rather than applying a harmless error analysis in which the burden rests on the government. *See generally Commonwealth v. Howard,* 538 Pa. 86, 99–100, 645 A.2d 1300, 1307 (1994) (distinguishing between scenarios involving an assessment of prejudice versus harmless error). Appellant candidly acknowledges that the claim is, in large part, previously litigated and, therefore, unreviewable in the present state post-conviction proceedings, *see* 42 Pa.C.S. § 9543(a)(3), and, accordingly, indicates that the issue is raised in the present proceeding merely as a means of preserving it for further review. *But see Evans v. Court of Common Pleas,* 959 F.2d 1227, 1230 (3d Cir.1992) (observing that "a petitioner who has raised the claim on direct appeal need not raise it again in a state post-conviction proceeding" (citation omitted)). Appellant asserts, nonetheless, that there is one aspect of the claim that should be presently considered, since this Court did not reflect on it in the direct appeal.

In this regard, Appellant claims that the *Bruton* error cannot be deemed harmless with respect to his robbery conviction, and, accordingly, with respect to the sentence of death (which was based solely on the aggravating circumstance that the killing occurred in the course of a robbery, *see* 42 Pa.C.S. § 9711(d)(6)), where the only evidence that Appellant had committed a robbery derived from the co-defendant's state-

redaction to comply with the dictates of *Bruton*. *See Gray,* 523 U.S. at 192–95, 118 S.Ct. at 1155–56. A majority of the Justices of this Court, however, maintain that *Gray* represents a new rule of law which should not be applied retroactively to cases, such as Appellant's, that were tried prior to its issuance. *See, e.g., Commonwealth v. Lopez,* 559 Pa. 131, 158 n. 18, 739 A.2d 485, 500 n. 18 (1999). In determining that a Confrontation Clause violation occurred in Appellant's case, this Court did not expressly rely on the same rationale as *Gray* (indeed, at the time, this Court had approved the use of symbols in redaction, *see, e.g., Commonwealth v. Lee,* 541 Pa. 260, 272–73, 662 A.2d 645, 651–52 (1995)), but merely stated that the co-defendant's "redacted statement did imply that the identity of X was Appellant." *Uderra,* 550 Pa. at 399, 706 A.2d at 339.

ment.[14] Appellant, however, misstates the record, since an eyewitness to the robbery and killing specifically testified that both Appellant and his co-defendant demanded money from the victim and went through his pockets. *See* N.T., June 1, 1993, at 65, 72. *See generally* 18 Pa.C.S. § 3701 (defining robbery, *inter alia,* as the infliction or threat of serious bodily injury "in the course of committing a theft," with the latter phrase including attempted theft). We decline to look around the previous litigation bar on the basis of such an argument.

## E. Suppression

 Appellant was arrested on the basis of an anonymous tip indicating that the person who shot the decedent was inside of a green automobile parked near the scene. He complains that, upon locating the described vehicle, police directed the occupants out of the car, interrogated Appellant about the shooting without administering *Miranda* warnings, arrested Appellant, and ultimately obtained a statement, a blood-stained red sweatshirt, and a 12–gauge shotgun shell from Appellant's car.[15] According to Appellant his arrest was illegal, its fruits should have been suppressed, and trial and post-verdict/appellate counsel were ineffective in failing to raise and litigate this issue.

Appellant is correct that officers, in the first instance, responded to the killing of Mr. Sharpe based an anonymous tip. Upon arriving at the scene, however, they confirmed that a person in fact had been shot and proceeded to investigate the location to which they were told that the shooter had retreated. The officers were obviously justified in proceeding with caution, and in requiring the occupants of the vehicle to exit, particularly as the windows were obscured and the killer

---

14. The co-defendant's statement, as read to the jury, indicated, in relevant part, that "X walked up to where we were at. X had the sawed-off shotgun. *X started to go into the guy's pockets. He got a couple of dollars out of his pockets,* just something real small and stupid."

15. Appellant also complains about a seizure of a shotgun shell from his person; however, he provides no citation to the record regarding any such evidence having been introduced at trial, and, in our review of the record, we have found none.

had utilized a shotgun. Although it is certainly questionable whether police had probable cause to arrest Appellant at that point, as the Commonwealth points out, the only aspect of any statement of Appellant's that was introduced into evidence at trial was his provision of his name and biographical information. To the extent that there was any error in the admission of such references, it would be harmless in light of the eyewitness identifications and other evidence. Moreover, the physical evidence in question was secured via separate search warrants based on affidavits of probable cause citing to statements of identified eyewitnesses. Accordingly, we hold that the PCRA court did not err in its dismissal of this set of claims.

### F. Failure to Investigate Guilt Phase Defenses Concerning Intoxication and Mental Health Deficits

 Under the umbrella of this claim, Appellant asserts several grounds for relief. First, he contends that trial counsel ineffectively failed to investigate, develop and present a voluntary manslaughter defense, by virtue of evidence that Appellant shot and killed the victim in a misguided attempt to prevent his co-defendant from being beaten and perhaps killed by the victim. Appellant relies on an affidavit from his co-defendant, which comports with his own penalty-phase testimony that the killing resulted from his having come to the co-defendant's aid after an attack by the victim. Appellant acknowledges that the evidence at trial established that, at the time of the shooting, the victim was not acting as an aggressor, but asserts that this merely reflects the "unreasonableness" aspect of an available unreasonable belief voluntary manslaughter defense. Alternatively, Appellant argues that his capacity to make a reasonable assessment of the situation was seriously compromised by his long-term and contemporaneous use of cocaine, borderline personality disorder, and history of childhood abuse and neglect. Second, Appellant asserts that trial counsel was ineffective for failing to investigate, develop, and present a voluntary intoxication defense, since it was known throughout the course of the criminal

proceedings that at the time of Appellant's offense, he was under the influence of cocaine. Third, Appellant contends that trial counsel was ineffective for failing to investigate, develop, and present a diminished capacity defense. Appellant includes layering averments and argumentation in his presentation of the three sub-parts of this claim; in particular, although he acknowledges that a claim of ineffectiveness for failing to pursue a diminished capacity defense was raised on direct appeal, Appellant claims that direct appeal counsel was ineffective for limiting the basis for the claim to Appellant's history of drug use and for failing to reference to his impaired mental health condition.

The PCRA court held, and the Commonwealth argues primarily, that all sub-parts of this claim have been previously litigated, and we agree. On direct appeal, this Court considered and rejected Appellant's arguments that his "counsel was ineffective for allegedly failing to investigate whether Appellant had used drugs in the past, whether Appellant was under the influence of drugs at the time of the murder and whether Appellant had a history of psychological problems," *Uderra*, 550 Pa. at 400, 706 A.2d at 339–40, and that counsel's stewardship was lacking in his failure to present a diminished capacity defense. *See id.* at 402–03, 706 A.2d at 340–41. The heart of the present claim derives from the same, underlying basis, namely, capacity-based impairments that are alleged to have affected Appellant's culpability. The legislative and judicial policies underlying the bar to consideration on collateral review of matters previously resolved on direct appeal foreclose further review in these circumstances.[16] *See Commonwealth v. Ragan*, 560 Pa. 106, 117, 743 A.2d 390, 395 (1999) (admonishing that "a petitioner cannot obtain post-conviction relief by alleging ineffectiveness of prior counsel but presenting previ-

16. Although it is true that the Court did not specifically address the claim of mental health impairment in the section of the opinion on direct appeal addressing Appellant's diminished capacity argument, the Court determined that Appellant was unable to rely on mental health information that was not communicated to counsel in another passage of the opinion. *See Uderra,* 550 Pa. at 400–01, 706 A.2d at 339–40.

ously litigated claims shrouded under novel theories to support the claim of ineffectiveness" (citations omitted)).

### G. Assertedly Misleading Evidence Presented by the Commonwealth

At trial, an eyewitness testified that Appellant was wearing a red sweatshirt at the time of the killing. However, another witness who did not testify at trial, Victoria Grin, a woman who spent the previous night with Appellant, had stated to investigating police that Appellant put on the red shirt after the crime. Appellant highlights the significance of this statement, since the Commonwealth argued that blood found on the red sweatshirt that Appellant was wearing at the time of his arrest was the victim's (although it was of insufficient quantity to type or age). In light of the statement, Appellant claims that the district attorney relied on facts and inferences that she knew to be false to connect Appellant to the crime, and thus violated Appellant's right to due process and a fair trial. Appellant's treatment of this claim includes layering averments and argumentation.

The Commonwealth observes that it was entitled to rely on the eyewitness's testimony and had no obligation to present the statement of Appellant's confidant to the jury. Moreover, Ms. Grin's statement to police also referred to Appellant's confession to her that he had just shot the victim, and, accordingly, there was good reason for trial counsel to avoid raising the statement on his own.

The Commonwealth has the better of these arguments.

### H. Reasonable Doubt Jury Instruction

Appellant complains that, in its guilt phase charge, the trial court instructed the jury that "[a] reasonable doubt is a doubt that would cause a reasonable, careful and sensible person to pause, hesitate, or refrain from acting upon a matter of highest importance in his or her own affairs." According to Appellant, this violated his due process rights by defining reasonable doubt in such a way as would require a juror to

"refrain" from acting altogether, rather than merely to "hesitate" before acting, thus significantly reducing the Commonwealth's burden from the constitutionally-approved level and infringing on the presumption of innocence. Appellant suggests that the alleged error is made obvious by comparison to Pennsylvania's standard reasonable doubt jury instruction, which provides that, "[a] reasonable doubt is a doubt that would cause a reasonably careful and sensible person to hesitate before acting upon a matter of importance in his own affairs" and which has been approved by the United States Supreme Court. *See Victor v. Nebraska,* 511 U.S. 1, 20, 114 S.Ct. 1239, 1250, 127 L.Ed.2d 583 (1994). Appellant provides layering averments and argumentation.

The Commonwealth observes, correctly, that this Court has previously approved, and indeed recommended, a reasonable doubt instruction centered the concept of restraint. *See Commonwealth v. Pearson,* 450 Pa. 467, 474, 303 A.2d 481, 484–85 (1973) (citing *Commonwealth v. Burns,* 409 Pa. 619, 635, 187 A.2d 552, 561 (1963)). It is noteworthy, however, that, since the issuance of these decisions, the "restraint" language has been subject to criticism. *See, e.g., Ramirez v. Hatcher,* 136 F.3d 1209, 1213 n. 7 (9th Cir.1998); *United States v. Tobin,* 576 F.2d 687, 694 (5th Cir.1978). Hence, as Appellant notes, the Pennsylvania standard jury instruction, wisely, utilizes the more commonly accepted "hesitate before acting" formulation.

■■■ Nevertheless, an imperfect instruction does not constitute reversible error where the charge, taken as a whole, fairly and accurately conveys the essential meaning. *See United States v. Park,* 421 U.S. 658, 674, 95 S.Ct. 1903, 1912–13, 44 L.Ed.2d 489 (1975) (indicating that " 'a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge' " (citation omitted)). Here, the trial court's charge utilized the restraint phraseology in the disjunctive in relation to the "hesitate before acting" language. Moreover, the instruction correctly communicated Appellant's presumed innocence, the Commonwealth's burden of proof, and the nature of a reasonable doubt, and directed the jurors to reach their decision based

upon all of the evidence. Finally, Appellant is unable to identify any other suspect language in the charge.

We therefore find the underlying claim to be without merit and relief unavailable with respect to this set of claims.

## I. Ineffectiveness for Failure to Investigate, Develop, and Present Substantial Mitigation

Appellant next complains that, in the penalty phase of his trial, his counsel presented a single witness (Appellant), when substantial, additional mitigation evidence should have been heard and considered by the jury in rendering its sentencing determination. According to Appellant, trial counsel failed: to investigate Appellant's traumatic childhood; to obtain relevant school records and records of Appellant's prior psychiatric treatment; to secure essential expert mental health evaluation and testing to evidence his impaired mental health; and even to begin preparing for the penalty phase until after entry of the guilt-phase verdict. Appellant's proffer on this subject included an affidavit from a psychiatrist to the effect that he suffers from a borderline personality disorder, post-traumatic stress disorder, bi-polar disorder, and psychosis; affidavits from family members documenting his dysfunctional upbringing, including substantial neglect and abuse at the hands of his parents; documentation of head injuries suffered by Appellant during his youth; school records documenting psychological and educational deficits; and records of Appellant's drug abuse and prior psychiatric commitment. Appellant acknowledges that this Court on direct appeal rejected this claim, but complains that such disposition was erroneously grounded on Appellant's failure to volunteer information, when the applicable standard focuses on counsel's obligation to inquire and investigate. On this point, Appellant asserts that the Court's prior opinion is directly contradicted by the United States Supreme Court's recent decision in *Williams v. Taylor*, 529 U.S. 420, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000). Moreover, Appellant highlights that his present claim does not rest solely upon the same evidence as was

524

relied upon at the direct appeal stage, and therefore, he contends that the previous litigation bar should not apply.

We note that substantial divergences of opinion exist among Justices concerning the availability of a hearing on and the proper merits resolution of claims of ineffective assistance of counsel for failing to investigate, develop, and present mitigating evidence in the penalty phase of a capital case.[17] Additionally, there are also differences in terms of what should and should not be deemed previously litigated on collateral review. *Compare, e.g., Commonwealth v. Stokes,* 576 Pa. 299, 304–05, 839 A.2d 226, 229 (2003) (finding a claim of ineffective assistance of counsel for failure to present, *inter alia,* mental-health mitigation previously litigated on direct appeal where the defendant had pursued a claim that his trial counsel was ineffective for failing to raise the no-significant-history-of-prior-convictions mitigator), *with Stokes,* 576 Pa. at 314, 839 A.2d at 235–36 (Saylor, J., dissenting) (taking the contrary view). All Justices are in alignment, however, that at least where the Court's reasoning and holding on direct appeal encompass the claim sought to be raised on collateral review, and there is no irrefutable, manifest error in the disposition, the previous litigation doctrine should be deemed to apply. *Accord id.*[18]

17. *Compare, e.g., Commonwealth v. Williams,* 557 Pa. 207, 245–49, 732 A.2d 1167, 1187–90 (1999) (requiring the affordance of a post-conviction evidentiary hearing on a similar claim), *with Commonwealth v. Rivers,* 567 Pa. 239, 252 n. 5, 786 A.2d 923, 930–31 n. 5 (2001) (Opinion Announcing the Judgment of the Court) (characterizing a dissenting position advocating a post-conviction evidentiary hearing as extending a "passport to a mitigated penalty"), and *Uderra,* 550 Pa. at 400–01, 706 A.2d at 339–40 (concluding that trial counsel's failure to present evidence of Appellant's psychological problems in mitigation could not establish a predicate for an ineffectiveness claim where "Appellant never revealed any such problems to [counsel]"), *with Commonwealth v. Basemore,* 560 Pa. at 290, 744 A.2d at 735 ("Obviously, ... different light falls upon counsel's performance depending upon whether he asked and was not told, or he did not ask and therefore was not told.").

18. In this regard, the narrower view of previous litigation expressed in the *Stokes'* dissent focused on the scope of the Court's ruling on direct appeal. *See id.*

In the present case, Appellant's claim of deficient stewardship of counsel for failure to investigate and present adequate mitigation was denied on direct appeal based upon Appellant's failure to cooperate with counsel and apprise him of relevant information, including the identity and location of family members and information concerning his mental health condition. *See Uderra,* 550 Pa. at 400–01, 706 A.2d at 339–40. Notably, the disposition was not dependent upon the quantity or quality of information supplied in the post-sentence proceedings, and thus, the Court's rationale also answers the claims as presently styled and developed by Appellant (albeit on different terms than Appellant wishes). Application of the previous litigation doctrine in such circumstances is jurisprudentially sound, in that it reasonably conserves judicial resources and fosters stability by foreclosing the repeated revisitation of claims that might otherwise generate ongoing divergence among those charged with the review function.

Given the Court's holding on direct appeal, then, the PCRA court did not err in applying the previous litigation bar.

## J. The District Attorney's Penalty–Phase Closing

Appellant argues that the district attorney minimized the jury's responsibility for the imposition of the death penalty by stating that the Legislature had prescribed the capital sentence. Specifically, Appellant points to the following passage from the prosecutor's penalty-phase closing:

I am going to ask you, as I said, to follow your oaths. Once again I ask each of you individually if under the law you felt that the evidence and the law supported the imposition of the death penalty, would you be able to stand and announce such a verdict and each of you assured me that you could. I am going to ask you that you continue to follow your promises, that you continue to follow your oaths, and I submit to you that when you do that, you will find one aggravating factor and no mitigating factor. I am not going to ask you—and I hope I haven't in any way misspoken, ask you in any way to give Jose Uderra the death penalty, because you do not by your verdict give Jose Uderra the death penalty.

We talked about earlier in this case how that was a case of recognition, that the eyewitnesses recognized Jose Uderra. They didn't have to identify him, they knew him from before. What I am going to ask you to do is not somehow give him the death penalty, but to recognize by your verdict that based upon what he did to Michael Sharpe, his actions on October 18th, based upon his actions on that day, actions that he was responsible enough to decide to take and carry out, based upon those actions I am going to ask you to recognize that he has earned the death penalty, earned the death penalty under the statutory system that is set up in the State of Pennsylvania, that he earned the death penalty when he set out that day to rob Michael Sharpe as the eyewitnesses have told you.

\* \* \*

He earned the death penalty by committing this killing as a means to committing a robbery, a felony of the first degree, and I ask you by your verdict to do that, to recognize that under the law in this state, under the scheme set up by the legislature, that today or October 18, 1991, this man by his actions and not by anything that we have done subsequent, but by his own actions on that day to Michael Sharpe earned the death penalty, and I ask you to recognize that fact.

N.T., June 7, 1993, at 42–44.

According to Appellant, these statements were grossly misleading in that they created the impression that the jurors' only option was to impose the death penalty, thereby unconstitutionally diminishing the jurors' essential sense of responsibility. *See generally Caldwell v. Mississippi,* 472 U.S. 320, 328–29, 105 S.Ct. 2633, 2639, 86 L.Ed.2d 231 (1985) (holding, *inter alia,* that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere"). Appellant includes layering averments and argumentation in the relevant portion of his brief. The Commonwealth, for its part, contends that the claim is previously

litigated by virtue of Appellant's having challenged other aspects of the district attorney's closing arguments on direct appeal, and, in any event, is meritless.

At the outset, we disapprove the district attorney's admonition to the jurors that "you do not by your verdict give Jose Uderra the death penalty," in light of the constitutionally-based requirement of maintaining the jurors' sense of responsibility. *See Caldwell,* 472 U.S. at 328–29, 105 S.Ct. at 2639. However, in context, in the relevant portion of her closing, the prosecutor was developing the statutory requirement for the sentencer to return a death verdict upon determining that there is at least one aggravating and no mitigating circumstances, *see* 42 Pa.C.S. § 9711(c)(iv), a central aspect of a sentencing scheme which has been deemed constitutionally sound. *See Blystone v. Pennsylvania,* 494 U.S. 299, 305, 110 S.Ct. 1078, 1082–83, 108 L.Ed.2d 255 (1990). Significantly, she also discussed the discrete weighing process in a separate passage of her closing, accurately explaining to the jurors that "[i]f there is aggravating factors (sic) proven and mitigating factors, you will have to weigh those factors and determine whether in fact the death penalty should be imposed." N.T., June 7, 1993, at 36. Indeed, the jurors' additional decision-making function upon their finding of both aggravating and mitigating circumstances was also emphasized by the trial court immediately before and after counsel's remarks. *See id.* at 32, 56. Furthermore, the Court repeatedly admonished the jury concerning its fundamental responsibility for the verdict. *See, e.g.,* N.T., June 7, 1993, at 31 ("You as a Jury must impose the sentence."); *id.* at 32 ("You must decide whether to sentence the Defendant to death or to life imprisonment."); *id.* at 58 ("Remember, your verdict is not merely a recommendation, it actually fixes the punishment at death or life imprisonment."). As the district attorney's remarks did not misstate the applicable law and, in context, there is no reasonable probability that they meaningfully diminished the jurors' understanding of their overall role as the sentencer, we conclude that relief is unavailable on this claim. *Cf. Commonwealth v. Henry,* 550 Pa. 346, 380, 706 A.2d 313, 330 (1997) ("Generally, a prosecutor's arguments to the jury are not a basis for the

granting of a new trial unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility towards the accused which would prevent them from properly weighing the evidence and rendering a true verdict.").[19]

## K. The Charge on Aggravating and Mitigating Factors

In its penalty-phase charge, the trial court instructed the jury that "aggravating circumstances are things about a killing

19. In concurrence, Justice Castille criticizes our disapproval of a prosecutor's statement to a capital sentencing jury that, at least read in isolation, facially contravenes United States Supreme Court precedent. Justice Castille appears to make three points in this regard: first, that the Court should not be looking at the merits of the claim in terms of whether the prosecutor misled the jury because the only claim that is presently subject to our review is the derivative ineffectiveness claim; second, the derivative claim is frivolous; and, third, that the Court should not comment on matters that are not absolutely dispositive of an issue in a case, including in capital litigation.

On the first point, and as previously noted, in *Commonwealth v. McGill* this Court announced a general rule directing remand of capital, post-conviction appeals presenting layered ineffectiveness claims that were briefed prior to *McGill's* issuance. *See supra*, at 3. The rule arose out of a concern for fundamental fairness, since *McGill* recognized that substantial uncertainties had arisen out of the Court's own difficulty in establishing a consensus approach to the preparation and presentation of a capital, post-conviction proceeding. *See McGill*, 574 Pa. at 584, 832 A.2d at 1024. *McGill's* sole exception, pursuant to which we have been proceeding from the outset of this opinion, *requires* an assessment of the viability of the underlying claim. *See McGill*, 574 Pa. at 591–92, 832 A.2d at 1024–25. There may be some disadvantages in this approach; it nevertheless was the compromise reached by a unanimous Court in *McGill*.

On Justice Castille's second point, having reviewed the relevant line of United States Supreme Court decisions, we disagree with the assertion that the derivative claim is frivolous, where the underlying claim involves a prosecutor's comment that, on its face, indicates that jurors are removed from the responsibility for a capital sentencing determination, contrary to *Caldwell's* express prohibition.

On Justice Castille's third point, we simply hold a substantially different view concerning the means available for effectuating this Court's constitutionally-prescribed supervisory responsibilities, particularly in capital cases. We also do not regard our discussion as in the nature of a sanction of the prosecutor, as Justice Castille suggests; rather, our concern is with regulating the conduct of the litigants in future capital cases in a manner consistent with United States Supreme Court precedent. Simply put, we do not countenance prosecutors, in any fashion

and a killer which would make a first degree murder case more terrible and deserving of a death penalty, while mitigating circumstances are those things that make the case less terrible and deserving of death." According to Appellant, this instruction diverted the jury's attention away from his personal, moral culpability as dictated by his background and his mental health, and toward an amorphous and unguided consideration of the circumstances of the crime. Thus, Appellant claims that the trial court's instruction, and the prosecutor's argument, impaired the jury's fundamental ability to give full effect to the mitigating evidence that was present in this case. As the Commonwealth notes, however, this Court has previously rejected this argument on its merits. *See, e.g., Commonwealth v. Johnson,* 572 Pa. 283, 324–25, 815 A.2d 563, 587 (2002) (citing *Commonwealth v. Stevens,* 559 Pa. 171, 207–08, 739 A.2d 507, 526–27 (1999)).

### L. Proportionality Review

Appellant contends that the database complied by the Administrative Office of Pennsylvania Courts, and utilized by this Court as a component of its proportionality review, is fundamentally flawed and inaccurate. Appellant acknowledges his awareness that this Court has rejected similar challenges, *see, e.g., Commonwealth v. Albrecht,* 554 Pa. 31, 60–61, 720 A.2d 693, 708 (1998) (citing *Commonwealth v. Gribble,* 550 Pa. 62, 91–92, 703 A.2d 426, 441 (1997)), but complains that the reasoning applied in those cases denies capital prisoners the opportunity to confront the basis for the Court's proportionality review. Here, as well, we find that our precedent is controlling.

### M. Claims Relating to the Meaning of a Life Sentence in Pennsylvania

■ During the penalty phase summation, trial counsel attempted to explain to the jury that if sentenced to life

or context, telling members of a capital sentencing jury that they are not responsible for their penalty verdict.

without parole, Appellant would remain in prison for the rest of his life and would not be released after some term of years. The district attorney objected, and indicated that, "[t]here is also a pardons scheme." In response, the trial court stated, "[t]here is a pardons system that the governor can impose at a later point. That's not before us." N.T., June 7, 1993, at 45. According to Appellant, the prosecutor's comments, and the trial court's response, contravened a line of authority forbidding the discussion of pardon and parole when answering a jury's questions about the meaning of life imprisonment, *see, e.g., Commonwealth v. Mills*, 350 Pa. 478, 487–88, 39 A.2d 572, 576 (1944), *modified by Commonwealth v. Clark*, 551 Pa. 258, 269–70, 710 A.2d 31, 36 (1998), and implied to the jury that pardons are ordinary occurrences. Appellant asserts that the comments were particularly misleading, because nothing about the statutory scheme authorizing pardons was communicated to the jury, which would have highlighted the rareness of their affordance. As a separate component of this claim, Appellant also argues that the trial court improperly failed to instruct the jury that a life sentence in Pennsylvania means life without the possibility of parole. Appellant recognizes that this Court has determined that such an instruction is required only if the defendant's future dangerousness is placed in issue before the jury, *see, e.g., Commonwealth v. Spotz*, 563 Pa. 269, 288–89, 759 A.2d 1280, 1291 (2000) (citations omitted), but claims that this in fact occurred in his case by virtue of the trial court's comment concerning the availability of a pardon, and the jury's awareness of the circumstances of his offenses, which would cause concern regarding Appellant's dangerousness in the event that he would ever be released. Appellant also includes layering averments and argumentation.

This Court has previously considered a prosecutor's reference to a potential pardon in the penalty phase of a capital trial to have been a fair response to defense argumentation where, as here, trial counsel has attempted to impart to the jury that there was no possibility that the defendant would ever be released from prison if a life sentence were to be imposed. *See Commonwealth v. Simpson*, 562 Pa. 255, 282,

754 A.2d 1264, 1278 (2000) (citing *Commonwealth v. Marrero,* 546 Pa. 596, 611, 687 A.2d 1102, 1109 (1996); *Commonwealth v. Clayton,* 516 Pa. 263, 283–87, 532 A.2d 385, 395–97 (1987)). The possibility of prejudice is ameliorated since the district attorney made no express reference to future dangerousness on Appellant's part, *see Simpson,* 562 Pa. at 281, 754 A.2d at 1278 ("That the jury rendered a sentence of death as a result of the prosecutor's question [raising the potential availability of a pardon] is even more unlikely considering the fact that the question make no reference to future dangerousness, the element that makes allusions to pardon or parole most prejudicial."), and in light of the trial court's admonition to the jury that matters concerning pardons were not before it. *Cf. id.*

▮▮▮ With regard to the availability of a life-means-life instruction under our precedent, as noted, Appellant points to no portion of the record making any reference to his future dangerousness. We reject Appellant's argument that the trial court's comment generally confirming the existence of a system for pardon in Pennsylvania but directing the jury that such matter was not before it created an implication of future dangerousness on Appellant's part.

### N. The Philadelphia District Attorney's Office Witness Security Program

Appellant contends that the Philadelphia District Attorney Office has a policy of routinely providing hotel accommodations and cash payments to Commonwealth witnesses and systematically withholding all evidence of this practice from both the defense and the courts. Appellant makes no proffer that witnesses in his case benefited from any such system, but seeks discovery to develop his allegations. As previously noted, however, the PCRA court certified that discovery was complete, without any challenge of record by Appellant. Moreover, this Court has previously rejected identical claims in the absence of an adequate proffer. *See, e.g., Morris,* 573 Pa. at 181, 822 A.2d at 698–99 (citing *Commonwealth v. Lark,* 560 Pa. 487, 497–98, 746 A.2d 585, 590–91 (2000)).

**O–Q. Prior Counsels' Stewardship in Failing to Litigate the Claims Raised on this Appeal; Asserted Cumulative Effect of Purported Errors; and Claimed Entitlement to an Evidentiary Hearing**

Appellant's remaining three claims rest on assertions that all prior counsel were ineffective for failing to litigate the claims raised in this appeal, that relief is required based upon the cumulative effect of purported errors, and that he is entitled to an evidentiary hearing. On the basis of our review set forth above, we also conclude that these claims do not require relief.

The order of the PCRA court is affirmed, and the Prothonotary is directed to transmit the record to the Governor in a timely fashion.

Justice CASTILLE files a concurring opinion.

Justice NEWMAN files as concurring opinion.

Justice NIGRO concurs in the result.

Justice CASTILLE, concurring.

Although I concur in the result, I write separately to address a number of concerns I have with the Majority Opinion.

First, I write concerning the question of the Third Circuit's recent criticism of this Court's approach to the procedural requirements for properly presenting a preserved claim of equal protection error under *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). *See Holloway v. Horn,* 355 F.3d 707 (3d Cir.2004). Mr. Justice Saylor notes that he agrees with that criticism and would reconsider this Court's *Batson* precedent on this collateral attack, while acknowledging that a majority of this Court does not deem that issue to be properly before us. *See* Majority op. at 86 n. 12. I do not dispute that the Third Circuit panel's unwillingness to respect this Court's decisions counsels in favor of our reexamining that precedent in an appropriate case. Respectfully, however, I do not believe that this is an appropriate case for

such a reexamination. The U.S. Supreme Court has not outlawed a legitimate role for the States in adopting reasonable procedural restrictions upon the litigation of federal constitutional claims. In my view, in the absence of specific adversarial presentations on the question of whether this Court's existing procedural decisions amount to an unconstitutional burden on the substantive litigation of preserved *Batson* claims under U .S. Supreme Court authority—the only authority which binds this Court—it is better not to pass upon the question of the propriety of this Court's precedent on this collateral attack, which involves a defaulted *Batson* claim raised only through the guise of ineffective assistance of counsel.

Second, I do not agree with the Majority's discussion of appellant's claim that his previous counsel were ineffective for failing to allege that he was incompetent to stand trial. Notwithstanding the Majority's initial, global disclaimer that it analyzes appellant's underlying defaulted claims only to determine the viability of his layered, "derivative" claims of counsel ineffectiveness, Majority op. at 79, the Majority's analysis of the competency claim does not make clear whether it is being deemed reviewable as a never-waivable due process claim, or as a derivative claim of counsel ineffectiveness, or both. In any event, I do not agree with the Majority Opinion to the extent that it may be read to suggest that the trial court has a *sua sponte* obligation to conduct a competency hearing for a counseled defendant, where the defendant's lawyer makes no such request. I also do not agree with appellant's claim—which the Majority states but does not directly address—that competency claims cannot be waived for purposes of PCRA review. I have addressed these points at length in my Concurring Opinion in *Commonwealth v. Santiago*, 855 A.2d 682 (Pa.2004) (Castille, J. concurring). For the reasons set forth in that Concurrence, I would make plain that appellant's claim is reviewable **only** as a layered claim of counsel ineffectiveness; and that claim is meritless because appellant has utterly failed in his burden to allege any factual predicate upon which his previous lawyers could have based a claim of incompetence.

Third, I respectfully disagree with the Majority's statement that it "disapproves" of a part of the prosecutor's closing argument at the penalty phase. Majority op. at 95. Since the remark was not objected to at trial, the question is not whether this Court would "approve" or "disapprove" of the remark if we had been presiding at trial and an objection had been raised. Indeed, if this was the direct appeal and a contemporaneous objection had been raised, our task would not be to approve or disapprove the remark. Instead, it would be to review the trial court's discretionary response to the objection if one had been asserted. The only issue upon collateral review is whether appellant's direct appeal counsel was constitutionally ineffective in failing to claim that appellant's trial counsel was ineffective for failing to object to the remark. In my view, given the role of closing argument, the existence of cautionary charges, the overall tenor of the remarks, and the controlling presumption that trial counsel was competent, the notion that appellate counsel was required to pursue this claim borders on the frivolous. I do not join in the Majority's hindsight sanction of the trial prosecutor.

Finally, I realize that it is easier to dispose of claims of counsel ineffectiveness—particularly in cases where counsel choose to burden this Court with prolix briefs raising dozens of claims and sub-claims of error, few of which have any real substance—as if the pleading of ineffectiveness is a mere conduit by which we proceed to review the defaulted, underlying claim as if it had been preserved. There is a danger in this approach, which this case has revealed. In my view, it is inappropriate to employ collateral review to opine upon, and indeed purport to modify, the underlying law that would be at issue if these were preserved claims of trial court error. Collateral review is not the place for such a practice. The focus must still be upon counsel's performance, and I would not lose sight of that fact.

Justice NEWMAN, concurring.

I join the Majority Opinion, but write separately to dissociate myself from Mr. Justice Saylor's adoption, albeit via

footnote, of the view of the Third Circuit in *Holloway* that our procedural requirements for the development of a full and complete record to establish a *prima facie* case of a *Batson* violation are an unreasonable application of federal law. *Compare Holloway v. Horn*, 355 F.3d 707, 728–29 (3d Cir.2004) *with Commonwealth v. Spence*, 534 Pa. 233, 627 A.2d 1176, 1182–83 (1993). As Mr. Justice Saylor properly recognizes in the text of the Opinion: "A majority of this Court is of the view that it would represent *dictum* to undertake in this case to reconsider the validity of the *Spence* requirements in light of the Third Circuit's *Holloway* decision." Op. at 86. Nevertheless, in a footnote of the same Opinion, Mr. Justice Saylor explains that he "is of a contrary view" and would prefer to undertake a reconsideration of our time-honored procedural requirements for establishing a *prima facie* case under *Batson. Id.* at 86 n. 12. As Mr. Justice Saylor acknowledges, however, the Commonwealth in this case has neither specifically addressed nor defended the validity of the *Spence* requirements before this Court. Therefore, absent an adequate presentation of adversarial arguments, we should at least temporarily delay the reconsideration of our precedent. Because the decisions of the Third Circuit regarding federal law are merely persuasive authority for this Court to contemplate and weigh, *see Hall v. Pa. Bd. of Probation and Parole*, 851 A.2d 859, 863 (Pa.2004),[1] we should not abandon our long-established jurisprudence until all parties involved in the proceedings have had an equal opportunity to develop and present meaningful arguments before us on this significant issue.

---

1. While the Opinion Announcing the Judgment of the Court did not garner a majority, six of seven Justices agreed with the general principle that decisions of an inferior federal court should be treated by this Court as persuasive authority where that decision interprets federal law.