**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| SHAUN C. WARRICK | : | |
| | : | |
| Appellant | : | No. 545 EDA 2022 |

Appeal from the PCRA Order Entered February 4, 2022
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0004005-2011

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| SHAUN C. WARRICK | : | |
| | : | |
| Appellant | : | No. 546 EDA 2022 |

Appeal from the PCRA Order Entered February 4, 2022
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0004006-2011

BEFORE: KUNSELMAN, J., KING, J., and SULLIVAN, J.

MEMORANDUM BY KING, J.: **FILED APRIL 19, 2023**

Appellant, Shaun C. Warrick, appeals from the order entered in the Philadelphia County Court of Common Pleas, which dismissed his first petition under the Post-Conviction Relief Act ("PCRA").[1] We affirm.

---

[1] 42 Pa.C.S.A. §§ 9541-9546.

In its opinion, the PCRA court fully and correctly set forth the relevant facts and procedural history of this case. (**See** PCRA Court Opinion, filed 4/25/22, at 1-5). Therefore, we do not restate them here.

Appellant raises the following issues for our review:

> 1. Did the PCRA court err in dismissing Appellant's PCRA petition without a hearing because trial counsel was ineffective and Appellant suffered prejudice because trial counsel failed to object to an erroneous jury charge in relation to first-degree murder which improperly conflated the concepts of specific intent to kill and malice?
>
> 2. Did the PCRA court err in dismissing Appellant's PCRA petition without a hearing because trial counsel was ineffective and Appellant suffered prejudice because trial counsel failed to request a cautionary instruction relating to other crimes/bad acts evidence wherein Appellant was alleged to have threatened witness Alicia Watkins regarding potential cooperation with police?
>
> 3. Did the PCRA court err in dismissing Appellant's PCRA petition without a hearing because trial counsel was ineffective and Appellant suffered prejudice because trial counsel failed to object to the trial court's incomplete jury instruction on consciousness of guilt when the court failed to instruct the jury that such evidence, by itself, is insufficient to sustain a guilty verdict?
>
> 4. Did the PCRA court err in dismissing Appellant's PCRA petition without a hearing because trial counsel was ineffective and Appellant suffered prejudice because trial counsel failed to object to the trial court's and prosecutor's remarks which improperly bolstered the Commonwealth's case?
>
> 5. Did the PCRA court err in dismissing Appellant's PCRA petition without a hearing because trial counsel was ineffective and Appellant suffered prejudice because trial counsel failed to investigate Appellant's potential defense that Appellant was at Traffic Court when the underlying crimes occurred?

6. Did the PCRA court err in dismissing Appellant's PCRA petition without a hearing because trial counsel was ineffective and Appellant suffered prejudice because the trial prosecutor deprived Appellant of a fair trial by engaging in racially improper jury selection which was highlighted by new access to such practices during the PCRA process?

7. Did the PCRA court err in dismissing Appellant's PCRA petition without a hearing because trial counsel was ineffective and Appellant suffered prejudice because trial counsel failed to object to the speculative testimony of Kelly Hunt that implicated Appellant?

8. Did the PCRA court err in dismissing Appellant's PCRA petition without a hearing because new evidence shows that the Commonwealth failed to disclose exculpatory materials from two of its key witnesses, Kiana Walker and Octavia Dugger?

9. Did the PCRA court err in dismissing Appellant's PCRA petition without a hearing because new evidence shows that multiple corrupt homicide detectives with a habit of corrupting the judicial process were involved in the investigation in Appellant's case and an evidentiary hearing and new trial are warranted because there are discovery and ineffectiveness issues associated with the failure to present this evidence at trial?

(Appellant's Brief at 4-6) (reordered for purpose of disposition).

Our standard of review of the denial of a PCRA petition is limited to examining whether the evidence of record supports the court's determination and whether its decision is free of legal error. *Commonwealth v. Conway*, 14 A.3d 101, 108 (Pa.Super. 2011), *appeal denied*, 612 Pa. 687, 29 A.3d 795 (2011). This Court grants great deference to the findings of the PCRA court if the record contains any support for those findings. *Commonwealth v. Boyd*, 923 A.2d 513, 515 (Pa.Super. 2007), *appeal denied*, 593 Pa. 754, 932 A.2d

74 (2007). We give no similar deference, however, to the court's legal conclusions. **Commonwealth v. Ford**, 44 A.3d 1190, 1194 (Pa.Super. 2012).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable Glenn B. Bronson, we conclude Appellant's claims merit no relief. The PCRA court opinion comprehensively discusses and properly disposes of the claims raised. (**See** PCRA Court Opinion at 5-26). Specifically, regarding Appellant's first issue, the court determined that trial counsel was not ineffective for failing to object to the court's instruction defining specific intent to kill and malice. Appellant claims the court conflated the two concepts, and argues that in cases of self-defense or voluntary manslaughter, a killing can be intentional but not with malice. Nevertheless, the court noted that self-defense and voluntary manslaughter were not at issue in this case so there was no possibility of confusion for the jury on the grounds alleged by Appellant. Moreover, the court's instruction accurately stated the law and tracked the exact language in the Pennsylvania Standard Criminal Jury Instruction.

With respect to Appellant's second issue, the court found that trial counsel was not ineffective for failing to request a cautionary instruction after Alicia Watkins testified that a few days after the shooting, Appellant told her that she "didn't have to say anything because they don't know nothing," in relation to speaking with the police. The court found that a cautionary

instruction about prior bad acts was unnecessary because Ms. Watkins did not testify that Appellant threatened her or intimidated her to prevent her from speaking with the police. While encouraging Ms. Watkins to stay silent evidenced consciousness of guilt, it was not a criminal act that required a Pa.R.E. 404(b) instruction.

Regarding Appellant's third issue, the court found no merit to Appellant's claim that trial counsel was ineffective for failing to object when the court did not instruct the jury that consciousness of guilt, by itself, is insufficient evidence for a conviction. Notably, the court did not suggest to the jury that they could convict based solely on consciousness of guilt but properly stated that it could be considered with all the other evidence in the case.

As it pertains to Appellant's fourth issue, the court found no merit to Appellant's claims of ineffective assistance regarding statements made by the court and the prosecutor that Appellant insists improperly bolstered the Commonwealth's case. Specifically, the court's comment instructing the jury not to converse with "anybody [who] is here to support the prosecution, family members of the decedent, for example" was in the context of cautioning jurors from speaking with anyone related to the case and did not serve to bolster the Commonwealth's case. Additionally, the prosecutor's comment to the Commonwealth witnesses to answer defense counsel's questions to the best of their ability did not improperly imply the prosecutor's personal belief that the Commonwealth's witnesses were credible.

Concerning Appellant's fifth claim that trial counsel failed to investigate Appellant's alibi evidence, the court noted that the fact that Appellant was at traffic court on the same day as the shooting did not preclude the possibility that Appellant had time to arrive at the scene of the murders. Further, Ms. Watkins testified that she accompanied Appellant to traffic court, where they remained for only approximately an hour and there were multiple eyewitnesses who placed Appellant at the scene of the murders.

With respect to Appellant's sixth issue, the court found that Appellant failed to establish that trial counsel was ineffective for failing to raise a **Batson**[2] challenge because the mere fact that the prosecutor noted the race and gender of the prospective jurors in his notes does not demonstrate actual purposeful discrimination. Further, there were no issues of race in the case, the final racial makeup of the jury was well balanced, and the prosecutor only utilized six of twenty preemptory strikes.

Regarding Appellant's seventh issue, the court determined that trial counsel was not ineffective for failing to raise a hearsay objection to Kelly Hunt's testimony that she overheard the decedent, Mercedes Ivery, speaking with Appellant on the phone prior to the murder. Ms. Ivery's statements were not offered for the truth of the matter asserted but as evidence of Appellant's state of mind and the court promptly instructed the jury to consider the

_____

[2] **Batson v. Kentucky**, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

evidence only for this purpose. Further, Appellant was not prejudiced by deficiencies in the prosecutor's form of questioning during Ms. Hunt's testimony because there is no indication that the prosecutor could not have elicited the same information even if trial counsel had objected.

With respect to Appellant's eighth issue, the court determined that Appellant did not suffer prejudice as a result of the Commonwealth's failure to disclose handwritten notes made by the prosecutor indicating that Kiana Walker and Octavia Duggar spoke to the prosecutor prior to the trial and stated that they did not see or remember anything from the shooting. Notably, Ms. Walker testified consistently at trial with the prosecutor's note, stating that she did not see the man leave the house where the killings took place, and that most of the information she recalled from the incident was based on information she received from a friend. Although the Commonwealth introduced an eyewitness account from Ms. Walker that she had provided to police, Ms. Walker disavowed that statement at trial. Thus, the handwritten note regarding the prosecutor's call with Ms. Walker stating that Ms. Walker did not see anything was substantially consistent with her in-court testimony, cumulative, and had little probative value. Additionally, it is clear from the totality of the notes regarding the prosecutor's conversation with Ms. Dugger, that Ms. Dugger's statement that she did not remember anything merely demonstrated an understandable reluctance to testify in court. Ms. Dugger's statement to the prosecutor that she did not remember anything was

inconsistent with her detailed statement to police and her trial testimony. While Appellant could have used the prosecutor's notes to impeach Ms. Dugger's testimony, the impeachment value would have been *de minimus*, and this evidence does not give rise to a reasonable probability that had the notes been disclosed, the outcome of trial would have been different.

Finally, the court found that Appellant is not entitled to relief based on after-discovered evidence of misconduct by various detectives involved in Appellant's case because the instances of misconduct cited by Appellant are unrelated to the instant case. Further, none of the witnesses in this case who were interviewed by these detectives claimed any kind of coercion or intimidation by police. Thus, Appellant's evidence of unrelated police misconduct would not likely result in a different verdict if a new trial were granted.

The record supports the PCRA court's findings. ***See Conway, supra***. Accordingly, we affirm on the basis of the PCRA court's opinion.

Order affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/19/2023

IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CRIMINAL TRIAL DIVISION

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | CP-51-CR-0004005-2011 |
| | : | CP-51-CR-0004006-2011 |
| | : | |
| v. | : | **FILED** |
| | : | |
| SHAUN WARRICK | : | APR 2 5 2022 |
| | | |

OPINION

Appeals/Post Trial
Office of Judicial Records

BRONSON, J.                                                April 25, 2022

On August 19, 2015, following a capital jury trial before this Court, defendant Shaun Warrick was convicted of two counts of first-degree murder (18 Pa.C.S. § 2502), one count of burglary (18 Pa.C.S. § 3502), one count of carrying a firearm without a license (18 Pa.C.S. § 6106), and one count of carrying a firearm on the streets of Philadelphia (18 Pa.C.S. § 6108). Following a penalty phase hearing on August 20, 2015, the Court imposed an aggregate sentence of two consecutive life sentences plus 16 to 32 years incarceration in state prison (18 Pa.C.S. § 1102(a)(1); 42 Pa.C.S. § 9711). Defendant was represented at trial by Jack McMahon, Esquire.

Defendant filed post-sentence motions, which the Court denied on December 10, 2015. On January 12, 2017, the Superior Court affirmed defendant's judgment of sentence and on June 20, 2017, the Supreme Court of Pennsylvania denied *allocatur*. Defendant was represented on his post-sentence motions and appeal by David Rudenstein, Esquire.

Defendant filed a *pro se* petition ("PCRA Petition") under the Post-Conviction Relief Act ("PCRA") on June 4, 2018. James F. Beradinelli, Esquire, was appointed to represent defendant on November 13, 2018. However, defendant retained Daniel Silverman, Esquire, to represent him, and Mr. Silverman entered his appearance on January 25, 2019.

Mr. Silverman filed an amended PCRA petition ("Amended Petition") on September 6, 2019, and a supplemental amended PCRA petition ("First Supplemental Amended Petition") on February 10, 2020. Defendant retained Jerome M. Brown, Esquire, as co-counsel to Mr. Silverman on December 18, 2020. Mr. Brown proceeded to file an additional supplemental amended PCRA petition ("Second Supplemental Amended Petition") on July 15, 2021.

The Commonwealth filed a motion to dismiss on November 2, 2021. On November 7, 2021, Mr. Silverman filed "Petitioner's Motion for Leave to Modify First Supplemental Amended PCRA Petition," which modified defendant's First Supplemental Amended Petition to include a claim under *Batson v. Kentucky*, 476 U.S. 79 (1986).[1] On November 23, 2021, Mr. Silverman filed a reply to the Commonwealth's motion to dismiss. On December 21, 2021, Mr. Brown filed a supplemental reply to the Commonwealth's motion to dismiss.

On December 21, 2021, the Court issued notice pursuant to Pa.R.Crim.P. 907 ("907 Notice") of its intent to dismiss defendant's petition, and the Court dismissed defendant's petition on February 4, 2022. After both Mr. Silverman and Mr. Brown moved to withdraw as counsel and were relieved by the Court, the Court appointed John Belli, Esquire, to represent defendant on appeal. Unfortunately, Mr. Belli passed away in February of 2022. Stephen O'Hanlon, Esquire, was appointed to represent defendant on February 16, 2022.

Defendant now raises nine grounds for relief on appeal from the PCRA court's order dismissing his PCRA Petition. *See* Statement of Matters Complained of on Appeal Pursuant to Pennsylvania Rule of Appellate Procedure 1925(b) ("Statement of Errors") at ¶¶ 1-9. Seven of defendant's claims are premised upon the alleged ineffective assistance of trial counsel. In particular, defendant claims that trial counsel was ineffective for failing to: (1) object to the

---

[1] *See Batson*, 476 U.S. at 89 (holding that a prosecutor's challenge to potential jurors solely on the basis of race violates the Equal Protection Clause of the United States Constitution).

2

definition of first-degree murder in the jury instructions; (2) request a cautionary instruction regarding bad acts evidence; (3) object to an incomplete instruction on consciousness of guilt; (4) object to improper remarks made by the Court and the Commonwealth; (5) investigate a potential alibi witness; (6) raise a *Batson* claim; and (7) object to testimony regarding witness Kelly Hunt. Statement of Errors at ¶¶ 1-6, 9.[2] Defendant additionally argues that the PCRA court erred in dismissing his claims that: (1) the Commonwealth failed to disclose exculpatory materials regarding Commonwealth witnesses Kiana Walker and Octavia Dugger; and (2) new evidence of police misconduct warrants a new trial. Statement of Errors at ¶¶ 7-8. For the reasons set forth below, defendant's claims are without merit, and the Court's order dismissing defendant's PCRA Petition should be affirmed.

## I. FACTUAL BACKGROUND

The factual background of this matter is set forth in the Court's Rule 1925(a) opinion filed in defendant's direct appeal as follows:

> At trial, the Commonwealth presented the testimony of Philadelphia Police Detectives John Logan and James Burke, Philadelphia Police Officers Heather Andrews, Robert Flade, Jesus Cruz, and Robert Bakos, FBI Agent William Shute, Philadelphia Assistant Medical Examiner Dr. Edwin Lieberman, Alicia Watkins, Octavia Dugger, Kim Ivery, Lisa Williams, Kelly Hunt, Crystal Smith, and Kiana Walker. Defendant did not present any witnesses. Viewed in the light most favorable to the Commonwealth as the verdict winner, the evidence established the following.

> On February 14, 2011, defendant, who had been arguing with his girlfriend, Tiffany Barnhill, recruited a friend, Alicia Watkins, to go to Barnhill's residence and fight her. N.T. 8/13/15 at 93-96, 224, 227-229 288-290, 298-299. Watkins agreed to go with defendant, and recruited her friend, Octavia Dugger, to accompany them. N.T. 8/13/15 at 96, 174-175. Defendant, Watkins, and Dugger then drove towards Barnhill's home in defendant's car. N.T. 8/13/15 at 97, 174-175. While driving to Barnhill's home, defendant made a series of phone calls to Marcedes Ivery, Barnhill's cousin, demanding to talk with Barnhill. N.T. 8/13/15 at 98-99; 8/14/15 at 147-150.

---

[2] For ease of disposition, defendant's claims have been reordered.

3

Upon arriving at Barnhill's home, located on the 5400 block of Rutland Street, shortly after 3:30 p.m., defendant exited the vehicle and approached the door. N.T. 8/13/15 at 65, 87, 100-102, 174, 178-179; 8/14/15 at 28-29, 175, 181; 8/17/15 at 59. Defendant kicked the door, breaking it open, and entered the house. N.T. 8/13/15 at 100-101, 174, 178; 8/14/15 at 29-30, 175. Watkins and Dugger remained outside. N.T. 8/13/15 at 100; 8/14/15 at 28-29.

Shortly after defendant entered the home, witnesses heard a series of gunshots coming from within the home. N.T. 8/13/14 at 101-102, 30; 8/14/15 at 30-31, 56. Defendant then ran out of the house, with Watkins and Dugger joining him as he returned to his car and drove away. N.T. 8/13/15 at 102, 179-180; 8/14/15 at 31, 177, 192-193. As defendant left the house, he placed something in the front of his pants. N.T. 8/14/15 at 31-33, 192-93. The day after the shooting, Watkins asked defendant what happened inside the home and defendant stated, "I fucked up." N.T. 8/13/15 at 103. Defendant would later tell Watkins that he thought Watkins would "tell on him." N.T. 8/13/15 at 104-105. Defendant also told Dugger not to "tell nobody about that day." N.T. 8/13/15 at 187.

Minutes after the shooting, Marcedes Ivery's younger sister, Lexus[1], was walking home to the Rutland Street house when two neighbors, who had seen defendant enter the home and heard the gunshots, called out to her. N.T. 8/14/15 at 35-36, 179. Lexus then called her mother, Kim Ivery, and told her about the gunshots in their home, which prompted Kim Ivery to call police. N.T. 8/13/15 at 234; 8/14/15 at 35, 179-180. No one other than defendant was seen entering or exiting the home, either thirty minutes before the shooting or after the shooting, before police arrived on scene. N.T. 8/14/15 at 34, 36.

[1] Lexus' last name was not given at trial.

When the police arrived, they immediately noticed the broken door and proceeded into the home. N.T. 8/13/15 at 60, 71-72. Upon entering the home and going upstairs, police found Barnhill and Ivery in the upstairs bedrooms, with multiple gunshot wounds. N.T. 8/13/15 at 60-62, 73-74; 8/17/15 at 19, 29. Both women were dead. N.T. 8/13/15 at 61-62. Police did not find anyone else in the home. N.T. 8/13/15 at 60, 63.

Ivery was shot a total of seven times: once in her face, once to the back left side of her head, twice in the left side of her chest, once in her right buttock, once in her left thigh and hip, and once in her right wrist. N.T. 8/17/15 at 20. The shot to Ivery's head penetrated her skull and brain. N.T. 8/17/15 at 23. One of the gunshot wounds to her chest penetrated her left lung and heart. N.T. 8/17/15 at 25. Barnhill was shot a total of five times: once in her left shoulder and neck, once in her upper chest, near her armpit, which penetrated her left lung, once through the breast, which also penetrated her left lung, once on her side, which penetrated her diaphragm and liver, and once in her abdomen, penetrating her pancreas. N.T. 8/17/15 at 29-32.

4

Police recovered a total of fourteen .40 caliber fired cartridge casings from within the house. N.T. 8/14/15 at 79. Later examination would show that these fired cartridge casings were all fired from the same firearm. N.T. 8/14/15 at 231, 234-236, 242. Police also recovered several projectiles, bullet jackets, and bullet jacket fragments, all of which were consistent with being fired from a .40 caliber firearm. N.T. 8/14/15 at 232, 237-243.

Police also conducted an analysis of the cell phone defendant possessed on the day of the murders. N.T. 8/13/15 at 274, 279-281; 8/14/15 at 127. Through cell phone tower analysis, the cell phone records showed that the possessor of that phone travelled to the area of the murders at the time of the shootings. N.T. 8/14/15 at 141-143. The records also detailed a series of phone calls between that phone and Ivery's cell phone throughout the early afternoon hours leading up to the time of the homicide. N.T. 8/14/15 at 147-150. The phone also was used to make a series of phone calls to the home phone of the crime scene prior to the murders. N.T. 8/14/15 at 148-151.

Trial Court Opinion, filed March 17, 2016, at pp. 2-4.

## II. DISCUSSION

An appellate court's review of a PCRA court's grant or denial of relief "is limited to determining whether the court's findings are supported by the record and the court's order is otherwise free of legal error." *Commonwealth v. Green*, 14 A.3d 114, 116 (Pa. Super. 2011) (internal quotations omitted). The reviewing court "will not disturb findings that are supported by the record." *Id.*

Seven of defendant's nine claims are premised upon alleged ineffective assistance of counsel. Statement of Errors at ¶¶ 1-6, 9. Under Pennsylvania law, counsel is presumed to be effective and the burden to prove otherwise lies with the petitioner. *Commonwealth v. Basemore*, 744 A.2d 717, 728 (Pa. 2000), n.10 (citing *Commonwealth v. Copenhefer*, 719 A.2d 242, 250 (Pa. 1998)). To obtain collateral relief based on the ineffective assistance of counsel, a petitioner must show that counsel's representation fell below accepted standards of advocacy and that as a result thereof, the petitioner was prejudiced. *Strickland v. Washington*, 466 U.S. 668,

5

694 (1984). In Pennsylvania, the *Strickland* standard is interpreted as requiring proof that: (1) the claim underlying the ineffectiveness claim had arguable merit; (2) counsel's actions lacked any reasonable basis; and (3) the ineffectiveness of counsel caused the petitioner prejudice. *Commonwealth v. Miller*, 987 A.2d 638, 648 (Pa. 2009); *Commonwealth v. Pierce*, 527 A.2d 973, 975 (Pa. 1987). To satisfy the third prong of the test, the petitioner must prove that, but for counsel's error, there is a reasonable probability that the outcome of the proceeding would have been different. *Commonwealth v. Sneed*, 899 A.2d 1067, 1084 (Pa. 2006) (citing *Strickland*, 466 U.S. at 694). If the PCRA court determines that any one of the three prongs cannot be met, then the court need not hold an evidentiary hearing as such a hearing would serve no purpose. *Commonwealth v. Jones*, 942 A.2d 903, 906 (Pa. Super. 2008).

### 1. Trial counsel's failure to object to definition of first-degree murder

Defendant's first claim is that trial counsel was ineffective for failing to "object to an erroneous jury charge in relation to first-degree [m]urder which improperly conflated the concepts of specific intent to kill and malice." Statement of Errors at ¶ 1. This claim is without merit.

During its final charge on the law, the Court instructed the jury on first-degree murder as follows:

> First degree murder is a murder in which the perpetrator has the specific intent to kill. To find the defendant guilty of this offense, you must find the following three elements were each proven beyond a reasonable doubt:
>
> First, that the alleged victim is dead.
>
> Second, that the defendant killed her.
>
> And, third, that the defendant did so with the specific intent to kill and with malice.

That's what we mean for purposes of first[-]degree murder by the word malice. We simply mean having the specific intent to kill. That's what it means.

A person has the specific intent to kill if he has a fully formed intent to kill and is conscious of his own intention. And as my earlier definition of malice indicates a killing by a person who has the specific intent to kill is, in fact, a killing with malice. Stated differently, a killing is with a specific intent to kill if it is willful, deliberate, and premeditated.

What do I mean by those three words in this context? The specific intent to kill including the premeditation needed for first[-]degree murder does not require planning or previous thought or any particular length of time. It can occur quickly, even in a fraction of a second. All that is necessary is that there be time enough, so that the defendant can and does fully form an intent to kill and is conscious of that intention.

Now, when deciding whether the defendant had the specific intent to kill, you should consider all the evidence regarding his words and conduct in the attending circumstances that may show his state of mind.

And if you believe that the defendant intentionally used a deadly weapon on a vital part of the victim's body, you may regard that as an item of circumstantial evidence from which you may, if you choose, infer that the defendant had the specific intent to kill.

N.T. 8/18/2015 at 121-23.

Defendant argues that when the Court told the jury that for purposes of first-degree murder, the term "malice" means, "having the specific intent to kill," the Court conflated the separate concept of malice and specific intent to kill. Amended Petition at p. 14. The entire basis for defendant's argument is that in cases of self-defense or voluntary manslaughter, a killing can be intentional, but not murder. In such cases, when circumstances are present that excuse or reduce culpability, the killing can be without malice, even though intentional. Amended Petition at 14-17. However, in the case at bar, self-defense and voluntary manslaughter were never at issue. The defense was that defendant was not the person who shot and killed the two victims. The jury was not charged on self-defense or voluntary manslaughter. Where, as here, self-defense and reduction to voluntary manslaughter are not at issue, a killing

7

with specific intent to kill is necessarily a killing with malice. Accordingly, there was no possibility of any confusion about the term "malice" in this case.

Moreover, the Court's instruction in this case accurately stated the law. The Court stated, "as my earlier definition of malice indicates a killing by a person who has the specific intent to kill is, in fact, a killing with malice." N.T. 8/18/2015 at 122. This instruction tracks exactly the language of Pennsylvania's Suggested Standard Criminal Jury Instructions. *See* Pa. SSJI (Crim), §15.2502A. While it is true that in cases of self-defense or reduction to voluntary manslaughter, additional instructions on the concept of malice would be included, they are irrelevant and never given when justification and excuse are not at issue.

Accordingly, the Court's instruction on first-degree murder was entirely proper. As a result, trial counsel could not have been ineffective for failing to object to it. No relief is due.

### 2. Trial counsel's failure to request a cautionary instruction regarding bad acts evidence

Defendant claims that trial counsel was ineffective for failing to "request a cautionary instruction relating to other crimes / bad acts evidence wherein [defendant] was alleged to have threatened witness Alicia Watkins regarding potential cooperation with police." Statement of Errors at ¶ 2. Defendant's claim is without merit.

During the trial, Commonwealth witness Alicia Watkins testified that she drove with defendant to the house where the victims were staying, that she saw defendant kick down the door of the house and enter, and then heard gunshots. N.T. 8/13/2015 at 100-102. Watkins also testified that several days after the killings, defendant told her that he thought she was "going to tell on him." N.T. 8/13/2015 at 104. She told the police that defendant said that she "didn't have to say anything because they don't know nothing." N.T. 8/13/2015 at 162. In its final charge,

8

the Court instructed the jury that if it believed this evidence, it could consider it as evidence of defendant's consciousness of guilt. The Court stated:

> You folks heard evidence in this case tending to show that the defendant may have attempted to discourage a witness from speaking to the police after the killings that are at issue in this case. If you believe this evidence, you may consider it as tending to prove the defendant's consciousness of guilt. You're not required to do so. You should consider and weigh this evidence, along with all of the other evidence in the case.

N.T. 8/18/2015 at 106-07. This instruction was taken directly from Pennsylvania's Suggested Standard Criminal Jury Instructions. *See* Pa. SSJI (Crim), § 3.15.

Defendant now argues that trial counsel should have requested an additional instruction directing the jury not to consider the defendant's alleged attempt to silence Watkins as improper propensity evidence. Amended Petition at p. 17. In particular, defendant states that the Court should have given the instruction applicable to evidence of other crimes and bad acts that are admitted under Rule 404(b) of the Pennsylvania Rules of Evidence. Such instructions would inform the jury that the evidence was admissible only for a limited purpose and could not be used by the jury to conclude that defendant had the propensity to commit criminal acts and is therefore guilty of the charged crimes. Amended Petition at. pp. 17-19.[3] Defendant's claim is without merit.

Ms. Watkins's testimony regarding defendant's attempt to discourage her from cooperating with the police was not admitted as "other crimes/bad acts" under Pa.R.E. 404(b). Ms. Watkins did not claim that defendant threatened her or coerced her in some other way. Rather, she testified that defendant told her that she did not have to talk to the police since they did not know anything. While encouraging her to be silent evidenced consciousness of guilt, it

---

[3] Under Pa.R.E. 404(b)(1), evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

9

was not a criminal act that required a Rule 404(b) instruction. *See Commonwealth v. Colon*, 241 A.3d 457 (Pa. Super. Ct. 2020) (non-precedential decision) (finding that the trial court accurately instructed the jury that it may consider witness testimony that the defendant told the witness not to talk to the police as evidence tending to show consciousness of guilt). Moreover, the Court's instruction fully advised the jury on the proper use of this evidence. N.T. 8/18/2015 at 106-07; *see See* Pa. SSJI (Crim), § 3.15.

Accordingly, trial counsel was not ineffective for failing to request an unnecessary cautionary jury instruction. No relief is due.

### 3. *Trial counsel's failure to object to incomplete instruction on consciousness of guilt*

Defendant claims that trial counsel was ineffective for failing to "object to the trial court's incomplete jury instruction on consciousness of guilt when the court failed to instruct the jury that such evidence, by itself, is insufficient to sustain a guilty verdict." Statement of Errors at ¶ 3. Defendant's claim is without merit.

As previously stated, the Court instructed the jury that it could consider Ms. Watkins's testimony as evidence of consciousness of guilt. *See* Section II(2), *supra*. Defendant argues that the Court's instruction "permitted conviction solely if the jury 'believed' that Warrick attempted to discourage Watkins from providing information to the police and thereby conceal such evidence." Amended Petition at p. 21. Defendant further argues that this "error...relieved the Commonwealth of its heavy burden to prove each element of the offense beyond a reasonable doubt." *Id.* Defendant claims that trial counsel's failure to object to the Court's "incomplete" instruction resulted in ineffective assistance of counsel. *Id.* at p. 20.

10

Contrary to defendant's argument, the Court never instructed the jury that it could convict defendant solely on the basis of evidence of consciousness of guilt.[4] Rather, the Court stated, "If you believe this evidence, you may consider it as tending to prove the defendant's consciousness of guilt. You're not required to do so. You should consider and weigh this evidence, along with all of the other evidence in the case." N.T. 8/18/2015 at 106-07. Moreover, as stated above in section II(2), the Court's instruction is the exact language of Pennsylvania's Suggested Standard Criminal Jury Instructions. *See* Pa. SSJI (Crim), §3.15. As the Court's instruction was complete and accurate, trial counsel was not ineffective for failing to object to it. No relief is due.

### 4. Trial counsel's failure to object to remarks by Court and Commonwealth

Defendant claims that trial counsel was ineffective for failing to "object to the trial court's and prosecutor's remarks which improperly bolstered the Commonwealth's case." Statement of Errors at ¶ 4. Specifically, defendant argues that trial counsel was ineffective for failing to object to (1) the Court's comment instructing the jury not to converse with "anybody [who] is here to support the prosecution, family members of the decedents, for example[;]" and, (2) the prosecutor's remarks after direct examination, instructing witnesses to "just answer [the defense counsel's] questions to the best of [their] ability." N.T. 8/13/2015 at 23; *id.* at 110; N.T. 8/14/2015 at 42; *id.* at 206; *id.* at 249; Amended Petition at pp. 22-24. Defendant claims that the Court's comments served as improper vouching for the Commonwealth's case, and the prosecutors remarks served as improper vouching for the Commonwealth's witnesses. Amended Petition at pp. 22-24. Defendant's argument is without merit.

As to the Court's comments instructing the jury not to converse with anyone there to support the prosecution, including the victims' families, defendant claims that "[s]uch an ill-

---

[4] The full instruction is quoted above in section II(2), at p. 9, *supra.*

11

advised remark served to bolster the credibility of the Commonwealth's case, signaling to the jury that the victims' families believed that Warrick was guilty and therefore 'supported the prosecution[.]'" Amended Petition at p. 22. During its preliminary instructions to the jury, the Court stated:

> Now, there are some folks who are involved in this case, a lot folks involved in this case, with whom you may not even have casual conversation with during this trial. And what do I mean by casual conversation? I'm talking about anything even like, hello, how are you, how's the weather, okay.
>
> Those kinds of exchanges are not permitted during the course of this trial with me, with the lawyers, with the defendant, and with any witnesses, who are testifying in the case, and also any member of the public who has an interest in the case, in the sense that if anybody is here to support the prosecution, family members of the decedents, for example, or anybody who is here to support the defendant, those folks also may have no conversations with you at all during the time that this case is going on.

N.T. 8/13/2015 at 23.

It is clear from these remarks that the Court was merely instructing the jury not to converse with any members of the public during the trial who had any interest in the outcome of the case. The Court included, as an example, the victims' families who might have been present to support the prosecution during the trial. This instruction was given to protect the defendant from a juror engaging in small talk, or other conversations, that might appear innocuous to the juror, but would have the potential for improper influence. For example, a friendly exchange, even about the weather, between the mother of a decedent and a juror, could improperly have an effect on the juror's ability to look at the evidence objectively. The Court's suggestion that a member of a homicide victim's family might be present to support the prosecution in no way implied that the Court was bolstering the credibility of anyone's case. The Court's preliminary instructions were entirely proper, and trial counsel cannot be found ineffective for failing to object to them.

12

Defendant's claim regarding the prosecutor's remarks is premised upon a statement the prosecutor made following the direct examination of eyewitnesses Alicia Watkins, Crystal Smith, Kiana Walker, and expert witness Officer Jesus Cruz. After concluding his direct examination, the prosecutor stated that defense counsel may have questions on cross examination and to "just answer them to the best of your ability." N.T. 8/13/2015 at 110; N.T. 8/14/2015 at 42; *id.* at 206; *id.* at 249. Defendant argues that "[t]hese comments had the effect if not the intention of conveying to the jury the prosecutor's own personal opinion that each of these witnesses had provided truthful testimony in his or her direct testimony." Amended Petition at p. 24.

Improper vouching for a Commonwealth witness occurs "where the prosecutor assures the jury that the witness is credible, and such assurance is based on either the prosecutor's personal knowledge or other information not contained in the record." *Commonwealth v. Cousar*, 928 A.2d 1025, 1041 (Pa. 2007). Here, the prosecutor simply instructed the witnesses to answer defense counsel's questions to the best of their ability. The prosecutor did not personally assure that any witness was credible, and did not indicate in any manner that there was information outside of the trial that supported the witnesses' credibility. As there was nothing improper about the prosecutor's remarks, trial counsel cannot be found ineffective for failing to object to them. No relief is due.

### 5. *Trial counsel's failure to investigate potential alibi*

Defendant claims that trial counsel was ineffective for failing to "investigate [defendant's] potential defense that [defendant] was at Traffic Court when the underlying crimes occurred." Statement of Errors at ¶ 5. Defendant argues that, had counsel done a reasonable investigation, he would have discovered that defendant's traffic court hearing on the day of the

13

murder was scheduled to start at 1:00 p.m., along with many other litigants, and that the Traffic Court staff entered the dispositions of his citations in the court computer system at 3:17 p.m. Amended Petition at pp. 25-26. Defendant alleges that because police paperwork indicates that the shooting took place at approximately 3:43 p.m., defense counsel, had he obtained these Traffic Court records, could have argued that "it was highly unlikely if not impossible for Warrick to have left Traffic Court somewhere close to 3:00 p.m. and committed these killings at 3:43 p.m." *Id.* at 27. Defendant's claim is without merit.

Defendant's proffered evidence does not constitute an alibi. As defendant candidly conceded in his Amended Petition, the proffered evidence "does not establish an air-tight alibi because of all the unknowns[.]" Amended Petition at p. 27. Neither the scheduled start time of his hearing, nor the time that court staff made entries in the computer system, prove when defendant left Traffic Court that day. Moreover, Alicia Watkins testified that she accompanied defendant to Traffic Court on the day of the murders, and that they were there for "maybe an hour" before they left. N.T. 8/13/2015 at 120. That would have left ample time for defendant to have committed the murders.

Moreover, there was overwhelming evidence placing defendant at the scene of the crime, including two eyewitnesses who drove with defendant to the scene of the shootings, and defendant's own inculpatory admissions. The Traffic Court records now proffered by defendant, which admittedly do not establish an alibi, would not have cast doubt on the compelling evidence that defendant was present at the scene of the killings when they occurred.

Accordingly, trial counsel was not ineffective for failure to investigate defendant's Traffic Court alibi. No relief is due.

14

## 6. Trial counsel's failure to raise Batson Claim

Defendant claims that trial counsel was ineffective because "the trial prosecutor deprived [defendant] of a fair trial by engaging in racially improper jury selection which was highlighted by new access to [the prosecutor's trial file] during the PCRA process." Statement of Errors at ¶ 6. Specifically, defendant proffers the trial prosecutor's handwritten notes during jury selection as evidence that the prosecutor considered race as a "primary factor in his decision whether to accept or strike that juror." First Supplemental Amended Petition at p. 2. Defendant notes that the prosecutor kept track of almost every prospective juror's race and gender by recording "B/F" for a black female, "B/M" for a black male, "W/F" for a white female, "W/M" for a white male, "H/M" for an Hispanic male, and "A/M" for an Asian male. *See* First Supplemental Amended Petition, Exhibit A. Additionally, the prosecutor used a total of six peremptory strikes, five of which were used on black potential jurors, and one used on a white potential juror. First Supplemental Amended Petition at p. 3. Defendant argues that the prosecutor's race-conscious use of peremptory strikes established a *prima facie* case of racial discrimination under *Batson v. Kentucky*, 476 U.S. 79 (1986), and trial counsel was ineffective for failing to raise an objection under *Batson* during trial. First Supplemental Amended Petition at pp. 3-13. Defendant's claim is without merit.

"[T]he government denies a defendant equal protection of the laws when it 'puts him on trial before a jury from which members of his race have been purposefully excluded.'" *Commonwealth v. Uderra*, 862 A.2d 74, 83 (Pa. 2004) (citing *Batson*, 476 U.S. at 85). *Batson* established a three-part inquiry for evaluating a defendant's claim of racial discrimination in jury selection:

> First, the defendant must make out a *prima facie* showing that the prosecutor has exercised peremptory challenges on the basis of race. Second, if the requisite

15

showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.

*Uderra*, 862 A.2d at 83 (citing *Hernandez v. New York*, 500 U.S. 352, 358-59 (1991)).

A *Batson* challenge must be raised during *voir dire* because the trial judge plays a "central role [] in assessing whether the defendant ha[s] established a *prima facie* case of purposeful discrimination, and, if so, in assessing the credibility of the race-neutral reasons offered by the prosecutor." *Commonwealth v. Smith*, 17 A.3d 873, 895 (Pa. 2011). Therefore, "[w]hen a *Batson* claim is not raised at trial, the only collateral challenge available in such a circumstance would be a derivative claim of trial counsel ineffectiveness." *Commonwealth v. Blakeney*, 108 A.3d 739, 769 (Pa. 2014) (internal citations omitted).[5] Where a *Batson* claim is raised for the first time during a PCRA proceeding, necessarily in the form of a claim of ineffective assistance of counsel, a defendant "must demonstrate 'actual, purposeful discrimination by a preponderance of the evidence,' as well as meeting the 'performance and prejudice' standard for demonstrating counsel's ineffectiveness." *Commonwealth v. Reid*, 99 A.3d 427, 459 (Pa. 2014) (citing *Uderra*, 862 A.2d at 87). In a PCRA proceeding, "an appellant is not entitled to the benefit of the burden of persuasion as to whether there is a race-neutral explanation for the prosecutor's use of peremptory challenges." *Reid*, 99 A.3d at 459 (citing *Uderra*, 862 A.2d at 86).

In order to demonstrate actual purposeful discrimination, "a defendant raising a *Batson* claim must make an adequate record specifically identifying the race of all the venirepersons who had been removed by the prosecution, the race of the jurors who served, or the race of jurors

---

[5] Accordingly, to the extent that defendant may be attempting to make a substantive *Batson* claim, and not a claim premised upon ineffective assistance of counsel, that claim has been waived.

acceptable to the Commonwealth who had been stricken by the defense, since otherwise [the Court] lacks an adequate record upon which to evaluate the *Batson* claim." *Commonwealth v. Simpson*, 66 A.3d 253, 262 (Pa. 2013) (internal quotations omitted). If a defendant can make an adequate record, the Court "must consider whether [defendant]'s proffer, if believed, would establish actual, purposeful discrimination, mindful that it is exponentially more difficult in the PCRA context to perform a reasoned assessment concerning the presence or absence of purposeful discrimination." *Simpson*, 66 A.3d at 262 (internal quotations omitted). "In the absence of such a showing [of actual, purposeful discrimination by a preponderance of the evidence], the petitioner cannot meet the *Strickland* standard." *Commonwealth v. Sepulveda*, 55 A.3d 1108, 1132 (Pa. 2012); *see also Commonwealth v. Rivera*, 199 A.3d 365, 386–87 (Pa. 2018); *Uderra*, 862 A.2d at 87.

In determining whether a defendant has shown actual, purposeful discrimination by a preponderance of the evidence, Courts must consider the totality of the circumstances. *See Commonwealth v. Edwards*, 177 A.3d 963, 972 (Pa. Super. 2018) ("[A]doption of a *per se* rule runs counter to the rationale of *Batson*, and that of several cases interpreting and applying the decision, all of which have encouraged courts to consider all relevant factors."). Factors that a PCRA court should consider include whether the record reflects an emphasis on race during *voir dire*, the final racial make-up of the jury, side-by-side comparison of jurors struck and accepted, whether the Commonwealth used all its peremptory strikes, whether the record reflects obvious race-neutral reasons to strike a potential juror, whether the case presented racial issues (difference in race between victim and defendant), and statistical evidence of unequal strikes. *Commonwealth v. Kennedy*, 237 A.3d 1081 (Pa. Super. 2020) (non precedential); *see*

17

*Commonwealth v. Ligons*, 971 A.2d 1125, 1143 (Pa. 2009); *Sepulveda*, 55 A.3d at 1132; *Simpson*, 66 A.3d at 262–63; *Reid*, 99 A.3d at 487; *Rivera*, 199 A.3d at 386–87.

Merely keeping track of race and gender during jury selection, as the prosecutor did in this case, does not establish a *prima facie* case of discrimination. In fact, noting the race and gender of prospective jurors is necessary to address a *Batson* claim. *See Commonwealth v. Spence*, 627 A.2d 1176, 1182 (Pa. 1993) (holding that an appellant's failure to make a record for review of his *Batson* challenge prevents the Court from making a determination as to whether the trial court erred in failing to find a *prima facie* case under *Batson*).[6]

Here, defendant has failed to proffer any evidence that could demonstrate actual, purposeful discrimination. First, the record does not reflect any emphasis on race during *voir dire*. Second, the final racial make-up of the jury was well balanced, with five black jurors, five white jurors, and two Hispanic jurors. Also, there were no racial issues present at trial, as the defendant, victim, and primary witnesses were all African American. Lastly, the prosecutor only used six of twenty peremptory strikes. Accordingly, as defendant cannot demonstrate that he suffered actual, purposeful discrimination, this claim of trial counsel ineffectiveness fails. No relief is due.

### 7. Trial counsel's failure to object to testimony of Kelly Hunt

Defendant claims that trial counsel was ineffective for failing to "object to the speculative testimony of Kelly Hunt that implicated [defendant]." Statement of Errors at ¶ 9. Defendant's

---

[6] PCRA counsel argued that the prosecutor's practice of keeping track of the race and gender of jurors was improper and shows "pre-occupation if not obsession with the race and gender of every juror." First Supplemental Amended Petition at p. 3. This contention is completely meritless. *Batson* challenges occur during jury selection and result in substantial delays while the jury panel, without hearing an explanation, sits and waits while the challenge is being adjudicated. Prosecutors and defense lawyers are called upon during the *Batson* hearing to promptly provide the necessary data required for the claim to be decided. It is irresponsible for prosecutors and defense lawyers *not* to record the necessary data regarding race and gender needed in the event of a *Batson* claim, and does not reflect any improper focus on race or gender.

18

claim is based upon Ms. Hunt's testimony regarding a telephone conversation that she overheard that decedent Marcedes Ivery had with defendant prior to the murder. Second Supplemental Amended Petition at pp. 19-20 (unpaginated). The relevant testimony was as follows:

> [Prosecutor]: So she [Ivery] looks at the phone and says it's Shaun?
> [Hunt]: Yes.
> [Prosecutor]: Okay. Now, does she answer? I mean does she respond?
> [Hunt]: She does.
> [Prosecutor]: Okay. And when she does, does she tell the other person at the end of the line stop calling my phone?
> [Hunt]: Yes.
> [Prosecutor]: Okay.
> [Hunt]: She didn't say it like that though but...
> [Prosecutor]: In a raised voice?
> [Hunt]: Yes.
> [Prosecutor]: Okay. And did she at any point also say she doesn't want to be with you anymore?
> [Hunt]: Yes.

N.T. 8/13/2015 at 288. Immediately following this testimony, the Court instructed the jury that, if it chose to believe that Ms. Ivery made the statement that she didn't want to be with the defendant anymore, then the statement was not admissible for its truth. *Id.* at 289-90. Rather, the jury was instructed to only consider the statement for the possible effect it may have had on the defendant's state of mind. *Id.* at 289.

Defendant claims trial counsel was ineffective for failing to object to the above line of questioning by the prosecutor because these questions (1) were leading, (2) lacked foundation, and (3) called for double hearsay. Second Supplemental Amended Petition at pp. 20-21 (unpaginated). Defendant's claims are without merit.

First, defendant claims that trial counsel should have objected to the leading nature of the questions. However, an objection to the form of these questions would not have kept out the evidence, as the prosecutor could have easily rephrased the questions in a non-leading form. Consequently, defendant suffered no prejudice from trial counsel's failure to object on this basis.

19

Next, defendant claims that there was no foundation for Ms. Hunt's testimony that the caller was Shaun. However, defendant did not proffer any evidence that shows that, had defense counsel made an objection, no foundation could have been established. Therefore, defendant failed to provide evidence to show that he was prejudiced from trial counsel's failure to object on this basis.

Lastly, defendant claims that Hunt's testimony that it was "Shaun", that is, defendant, on the phone call with Ivery, and that Ivery told defendant that she did not "want to be with [him] anymore," was double hearsay. There were not, however, two levels of hearsay. As to "Shaun" being on the phone, Hunt testified from personal knowledge that Ivery told her it was "Shaun" on the phone, establishing that Ivery made the statement. While Ivery's statement was hearsay, Rule 803(1) of the Pennsylvania Rules of Evidence provides an exception to the hearsay rule for statements describing or explaining an event or condition that are made while or immediately after the declarant perceived it. Pa.R.E. 803(1). Here, Ms. Ivery announced "it's Shaun" while looking at the face of her phone. Moreover, she then proceeded to engage in a conversation with the caller, which by the context of the conversation overheard by Hunt, clearly confirmed that the caller was Shaun.

Finally, as stated above, Ivery's statement that she did not want to be with defendant anymore was never admitted for its truth, and the jury was instructed accordingly. The statement, whether true or not, was highly relevant regarding defendant's motive to kill Ivery and his mental state.

Accordingly, defendant's claim that trial counsel was ineffective for failure to object to Kelly Hunt's testimony is without merit. No relief is due.

20

### 8. Commonwealth's failure to disclose notes regarding witnesses Kiana Walker and Octavia Dugger

Defendant claims that the Commonwealth "failed to disclose exculpatory materials from two of its key witnesses, Kiana Walker [and] Octavia Dugger." Statement of Errors at ¶ 7. In particular, defendant argues that the Commonwealth violated *Brady v. Maryland*, 373 U.S. 83 (1963) by failing to disclose the prosecutor's handwritten notes regarding pretrial telephone calls the prosecutor had with these witnesses. First Supplemental Amended Petition at p. 13.

Under *Brady*, exculpatory evidence not disclosed to the defense will give rise to a due process violation and will require a new trial if the exculpatory evidence is "material" either to guilt or punishment. 373 U.S. at 87; *see also* Pa.R.Crim.P. 573(B)(1)(a) (specifying, as mandatory discovery, "[a]ny evidence favorable to the accused that is material either to guilt or to punishment, and is within the possession or control of the attorney for the Commonwealth"). If the police possess evidence that is favorable to the defense, then the Commonwealth is deemed to be responsible for its disclosure even if it is solely in the possession of the police. *See Commonwealth v. Lambert*, 884 A.2d 848, 853 (Pa. 2005) (quoting *Brady*, 373 U.S. at 87).

Therefore, to establish a *Brady* violation, defendant must demonstrate that: "(1) the prosecution concealed evidence; (2) which was either exculpatory evidence or impeachment evidence favorable to him; and (3) he was prejudiced by the concealment." *Simpson*, 66 A.3d at 264. In order to establish prejudice, defendant "must demonstrate a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability for these purposes is one which undermines confidence in the outcome of the trial." *Id.* (internal quotations and citations omitted). Moreover, "*Brady* evidence may not be cumulative of other evidence, cannot have been equally available to the

21

defense, and cannot have been discoverable through the exercise of reasonable diligence." *Id.* (internal citations omitted).

Here, the alleged *Brady* material consists of handwritten notes made by the prosecutor that were found in the Commonwealth's file regarding conversations between the prosecutor and Ms. Walker and Ms. Dugger. First Supplemental Amended Petition at p. 13. According to the notes, Ms. Walker called the prosecutor on December 9, 2013, and told him that she "didn't see anything." First Supplemental Amended Petition, Exhibit D. As to Ms. Dugger, the notes memorialized a December 5, 2013 call in which Ms. Dugger apparently told the prosecutor that she did not "remember anything" regarding the murder incident. First Supplemental Amended Petition, Exhibit E. Since both Walker and Dugger were purported eyewitnesses to defendant's presence at the scene of the murders, a conversation in which one witness denied seeing anything, and the other denied remembering anything, would be exculpatory material. However, defendant suffered no prejudice by not having access to the notes regarding these conversations.

As to Ms. Walker, on the day of the murder, she provided the police with an eyewitness statement, which was introduced at trial.[7] N.T. 8/14/2015 at 187-206. In this statement, Ms. Walker said that prior to the murder, she and her friend Crystal were sitting on her porch when she saw a man and two women approach the house in which the decedents were killed. *Id.* at 191. She then said that she saw the man walk up the front steps of that house and kick down the door. *Id.* While the man was still in the house, Ms. Walker and her friend heard gunshots, causing them to head into Ms. Walker's house. *Id.* at 192. While they were entering her house, they saw two women run down the front steps of the house where the killings took place and flee

---

[7] Because, as is discussed below, Ms. Walker's in-court testimony was inconsistent with her statement to police, the statement was admissible under the hearsay exception for prior inconsistent statements signed and adopted by the declarant. *See* Pa.R.E. 803.1(1)(B).

the scene. *Id.* Ms. Walker and her friend then looked out the front window and saw the man leave the house where the killings took place while putting something in his pants and proceed to run in the same direction as the two women. *Id.*

At trial, however, Ms. Walker disavowed the eyewitness account given to the police. She testified that at the time of the murder she was not wearing her glasses and therefore could not see well. *Id.* at 183, 209. She further testified that she did not see the man leave the house where the killings took place, and that most of the information she recalled from the incident she received from her friend Crystal. *Id.* at 177-78, 185. When asked about the statement she gave to police, she did not deny making the statement, but contended that most of the police statement was based on what Crystal had told her. *Id.* at 193. Therefore, Ms. Walker's December 9 phone call with the prosecutor, in which she claimed that she "didn't see anything," was substantially consistent with her in-court testimony. Accordingly, the December 9 statement was cumulative and had little probative value.

Defendant claims that the prosecutor's concealment of Ms. Walker's December 9 statements allowed the prosecutor to argue that her trial testimony was recently fabricated. First Supplemental Amended Petition at p. 15. Therefore, defendant argues, had the December 9 statement been disclosed, defense counsel could have rebutted the charges of fabrication with the December 9 prior consistent statement. *Id.* However, prior consistent statements offered to rebut a charge of recent fabrication are only admissible in evidence if the prior statement was made before the motive to fabricate existed. Pa.R.E. 613(c)(1). Here, the motive to fabricate was Ms. Walker's reasonable fear of testifying in a murder trial against someone charged with murdering two defenseless women. Because that motive was precisely the same when she spoke to the prosecutor on December 9 in preparation for trial, and when she testified at the trial, Ms.

23

Walker's December 9 prior consistent statement would not have been admissible. As a result, the notes regarding the statement could not have affected the outcome of the trial, and therefore do not give rise to a *Brady* violation. *Simpson,* 66 A.3d at 264.

As to Ms. Dugger, her testimony at trial was consistent with a detailed memory of the day of the murders. She described her ride with defendant to the house where the killings occurred and the events that transpired thereafter. In particular, she described defendant getting out of the car and kicking in the door to the house, and defendant telling her thereafter not to tell anyone she was with him that day. N.T. 8/13/2015 at 174-87. While her memory was refreshed as to some details by a statement that she gave to police about a month after the murders, Ms. Dugger never disavowed the detailed statement to police. N.T. 8/13/2015 at 181-93.

The alleged *Brady* material regarding Ms. Dugger consists of the prosecutor's notes regarding her December 5, 2013 phone call in which she said that she did not "remember anything." However, the prosecutor's notes state that Ms. Dugger also said during the call that she was eight months pregnant and on bedrest. Moreover, the notes indicate that her comment that she did not "remember anything" about the incident occurred after the prosecutor apprised her of the date that she was then scheduled to testify in court against defendant, that is, December 11, 2013, six days later. First Supplemental Amended Petition, Exhibit E.

It is clear from the totality of the notes of the December 5 call, that Ms. Dugger's statement that she did not remember anything, which is belied by her detailed statement to police and her trial testimony, merely demonstrated an understandable reluctance to testify in court. While defendant could have used the statement to impeach Ms. Dugger's testimony, in the context of the entire memorialized conversation, the impeachment value would have been deminimus. As a result, the notes do not give rise to a reasonable probability that had they been

24

disclosed, the outcome of the trial would have been different. Therefore, the notes do not give rise to a *Brady* violation. *Simpson,* 66 A.3d at 264.

### 9. *Unrelated police misconduct*

Defendant next claims that "new evidence shows that multiple corrupt homicide detectives with a habit of corrupting the judicial process were involved in the investigation in [defendant's] case[.]" Statement of Errors at ¶ 8. The "new evidence" that defendant refers to is evidence of police misconduct by Philadelphia police detectives in unrelated cases. Defendant alleges that police misconduct of detectives who played a role in defendant's case is after-discovered evidence that entitles him to a new trial.

After-discovered evidence will give rise to relief when the proponent can "demonstrate that the evidence: (1) could not have been obtained prior to the conclusion of the trial by the exercise of reasonable diligence; (2) is not merely corroborative or cumulative; (3) will not be used solely to impeach the credibility of a witness; and (4) would likely result in a different verdict if a new trial were granted." *Commonwealth v. Crumbley,* --- A.3d ----, 2022 WL 221556, at *4 (Pa. Super. Jan. 26, 2022); *see* 42 Pa.C.S. § 9543(a)(2)(vi). Failure to satisfy any one prong is fatal to the claim. *See Commonwealth v. Solano,* 129 A.3d 1156, 1180 (Pa. 2015) ("As this test is conjunctive, failure to establish one prong obviates the need to analyze the remaining ones.").

Here, defendant relies on allegations of misconduct in unrelated cases by former Philadelphia Police Detectives Jenkins, Williams, Singleton, and Nordo as evidence that they committed misconduct in defendant's case. During the investigation into the murders here at issue, Detectives Singleton and Jenkins took the statements of Alicia Watkins, Octavia Dugger, and Kiana Walker. *See* Commonwealth Exhibits 98, 109, 110. Detective Singleton interviewed

25

Kim Ivery, and Detective Jenkins interviewed Kelly Hunt. *See* Commonwealth Exhibits 99, 100. Detectives Williams and Singleton interviewed Crystal Smith. *See* Commonwealth Exhibit 107. Each of these witnesses testified during the trial, and none of them ever denied making their statement or claimed any kind of coercion. Although Ms. Walker retracted much of her statement by admitting she received most of the information from Crystal Smith, she never denied making the statement to police. N.T. 8/14/2015 at 192-93.

While defendant cites numerous cases of misconduct by these detectives, none of those cases have any connection to defendant's case. Furthermore, not a single witness interviewed by any of these detectives denied making their police statements or claimed any kind of coercion, and defendant has failed to proffer any new evidence of coercion. Accordingly, defendant's evidence of unrelated police misconduct clearly would not likely result in a different verdict if a new trial were granted. No relief is due. *See Crumbley,* at *4.

### III. CONCLUSION

For all of the foregoing reasons, the Court's order dismissing defendant's PCRA Petition should be affirmed.

BY THE COURT:

_____
GLENN B. BRONSON, J.

26

Commonwealth v. Shaun Warrick                          CP-51-CR-0004005-2011
Type of Order: Opinion                                 CP-51-CR-0004006-2011

## PROOF OF SERVICE

I hereby certify that I am this day serving the foregoing Court Order upon the person(s), and in the manner indicated below, which service satisfies the requirements of Pa.R.Crim.P.114:

**Defense Counsel:**

Stephen T. O'Hanlon, Esquire
2 Penn Center Plaza, Suite 1410
1500 John F. Kennedy Boulevard
Philadelphia, PA 19102

Type of Service:        ( ) Personal (**X**) First Class Mail () Other, please specify:

**Assistant District Attorney:**

Lawrence Goode, Esquire
Interim Supervisor, Appeals Unit
Office of the District Attorney
Three South Penn Square
Philadelphia, PA 19107-3499

Type of Service        ( ) Personal () First Class Mail (**X**) Other, please specify: *Interoffice*

**Additional Party:**

Joseph D. Seletyn, Esquire
Office of the Prothonotary - Superior Court
530 Walnut Street - Suite 315
Philadelphia, PA 19106

Type of Service        ( ) Personal ( ) First Class Mail (**X**) Other, please specify: *Interoffice*

**Dated: April 25, 2022**

_Jonathan P. Rava_
Jonathan P. Rava, Esq.
Law Clerk to Hon. Glenn B. Bronson